**UNITED STATES of America,**

v.

**Theodor SZEHINSKYJ.**

**No. CIV. A. 99–5348.**

United States District Court,
E.D. Pennsylvania.

July 24, 2000.

and therefore, I will refrain from making that determination at this time.

William H. Kenety, David W. Folts, Eli M. Rosenbaum, U.S. Dept. of Justice, Office of Special Investigation, Robert Groner, Washington, DC, for U.S.

Andre Michniak, Philadelphia, PA, for Defendant.

## *MEMORANDUM*

DALZELL, District Judge.

The Government has filed this action under Section 340(a) of the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1451, asking us to revoke the United States citizenship of defendant Theodor Szehinskyj because of his alleged service as a Waffen SS Death's Head Battalion concentration camp guard during World War II. After a nonjury trial, this Memorandum will constitute our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

Given the gravity of the relief the Government seeks against this 76–year–old citizen, we must consider in extended detail the evidence developed during his five-day trial. Our canvass regrettably but necessarily must include exposition of grisly details of the horrific concentration camp system that was the soul of the Third Reich.

## I. Background Facts and Claims

The Government alleges in its one-count complaint that Szehinskyj served as an armed Nazi concentration camp guard during World War II and therefore was not entitled to the immigrant visa he received under the Displaced Persons Act of 1948 ("DPA"), Pub.L. No. 80–774, ch. 647, 62

Stat. 1009, *as amended*, June 16, 1950, Pub.L. No. 81–555, 64 Stat. 219.[1] Szehinskyj vigorously disputes these allegations, claiming that he was a slave laborer on a farm belonging to Hildegard Lechner near Schiltern, Austria during the time of his alleged Nazi service. He maintains that he was never a member of the SS.

Szehinskyj was born in Malnow, in the Lvov District of Poland,[2] on February 14, 1924. He considered himself a Ukrainian national and was fluent in both Ukrainian and Polish. He completed about seven grades of school and later worked on his family's small farm. *See* Joint Pretrial Stip. at 22–24.

In December of 1941, Szehinskyj went to Lvov, where he had friends, to look for work because the Soviets had collectivized his family's farm after their 1939 invasion of Malnow. He found work in Lvov chopping wood. *See id.* at 25. In February of 1942, German soldiers captured Szehinskyj and a group of other young people in Lvov, loaded them onto trucks, and eventually transported them to Krems, Austria, near Vienna. In Krems, Szehinskyj was processed in a labor office (*i.e.*, he gave his name and identifying information to labor officials) and then was placed behind a counter with other forced laborers-to-be, where prospective "employers" reviewed them and selected those they wanted. Frau Lechner chose Szehinskyj to work on her remote Austrian farm while her husband was serving in the *Wehrmacht. See id.* at 25–26. Before Szehinskyj left the labor office, the officials there explained the work rules to him, *e.g.*, that he could not leave his employer. The *arbeitskarte* (work card) that the Krems labor office prepared for him contains an expiration date of January 31, 1943. *See id.* at 27;

*see also* Ex. G–24 (Szehinskyj's *arbeitskarte*, bearing the January 31, 1943 expiration date).

Szehinskyj claims that he remained on the Lechner farm until November of 1944. He testified that at that time, he left the farm with a group of fleeing refugees and spent the next several months performing work on different farms, eventually ending up in a displaced persons camp in Vilseck, Germany.

The Government contends that Szehinskyj left the Lechner farm sometime prior to January of 1943, before his Nazi-issued *arbeitskarte* expired. It claims that from January 15, 1943 until the spring of 1945, Szehinskyj served as an armed Waffen SS Totenkopf Division guard at the Gross–Rosen, Sachsenhausen, and Warsaw concentration camps. It also claims that he was involved in a 1945 prisoner transport from Sachsenhausen to the concentration camp at Mauthausen, after which he likely went on to serve as a guard at the concentration camp at Flossenbürg.

In 1950, Szehinskyj entered the United States with his wife and young daughter on an immigrant visa issued to him under the DPA. *See* Ex. G–133 (Szehinskyj's immigration file). After working on a farm in York County, Pennsylvania, Szehinskyj moved his family to the Philadelphia area in the mid 1950s and got a job as a machinist for the General Electric Company, from which he retired in 1984. The Delaware County Court of Common Pleas naturalized him as a citizen on March 13, 1958. *See id.*

## II. Summary of the Evidence

### A. *The Government's Case*

At the heart of the Government's case are six Nazi wartime documents that, ac-

---

1. The DPA was specially enacted in 1948 to accommodate the large number of refugees wishing to immigrate to the United States after the war. *See, e.g., United States v. Breyer*, 41 F.3d 884, 889 (3d Cir.1994).

 The legal basis for the Government's argument is discussed below at Part V.

2. During the twentieth century, the Lvov District was in turn part of the Austro Hungarian Empire, the Ukrainian People's Republic, the Western Ukrainian People's Republic, Poland, the U.S.S.R., Nazi-occupied Poland, the U.S.S.R., and, currently, Ukraine. Malnow was a town of about four or five hundred families. *See* Joint Pretrial Stip. at 23.

cording to the testimony of Dr. Charles W. Sydnor, the Government's expert historian,[3] specifically identify Szehinskyj as a Waffen SS Totenkopf (or "Death's Head") Division concentration camp guard. These documents are concentration camp Change of Strength Reports[4] for May 1943, September 1943, and May 1944, *see* Exs. G–45, G–61, and G–62; two Troop Muster Rolls,[5] *see* Exs. G–44 and G 63; and a February 13, 1945 Transfer Order, *see* Ex. G–64.[6]

According to Dr. Sydnor, these documents demonstrate that Szehinskyj joined the Waffen SS on January 15, 1943 and was first assigned to the Totenkopf Battalion at the Gross–Rosen concentration camp, located in lower Silesia. On May 19, 1943, he was transferred to Sachsenhausen, in Oranienburg, fifteen miles north of Berlin. *See* Ex. G–45 (the May, 1943 Change of Strength report listing Szehinskyj at line 21). On September 29 of that year, he was transferred to the new Warsaw camp constructed adjacent to the levelled Warsaw Ghetto, *see* Ex. G–61 (Change of Strength report for September of 1943 listing Szehinskyj at line 118). The following May, in preparation for the closing of the Warsaw camp because of the Red Army's advance, he was sent back to Sachsenhausen, *see* Ex. G–62 (a Change of Strength report for May, 1944 listing Szehinskyj in line 116); Ex. G–63 (a Troop

Muster Roll prepared in the administrative office at Sachsenhausen showing that Szehinskyj arrived from Warsaw on May 4, 1944). He and many other guards left Sachsenhausen on February 13, 1945 to assist on a prisoner transport to Mauthausen concentration camp, about 300 miles south in Austria, *see* Ex. G–64 (a Transfer Order dated February 13, 1945). Dr. Sydnor also testified that Szehinskyj most likely went on to the Flossenbürg concentration camp, though the Government is not seeking to prove this as part of its case. The Transfer Order states that Szehinskyj and the other Totenkopf guards were "to be transferred to the SS Death's Head Battalion of Flossenbürg" after guarding the prisoner transport to Mauthausen. *See* Ex. G–64 (English translation).

The Government's case is also based on the testimony of Hildegard Lechner. Frau Lechner, whose *de bene esse* deposition in connection with this case was taken on February 10, 2000 in Salzburg, Austria, testified that Szehinskyj did work on her farm, but left in the fall of 1942.[7] She remembers selecting Szehinskyj at the labor office in Krems to work on her farm while her husband was fighting with the German army. She stated that she treated him as a member of her family, turned over to him the forty *Deutschmarks* she

3. We without hesitation qualified Dr. Sydnor as an expert in Nazi-era German history, Nazi policies and practices, and the history of the SS and the concentration camp system. *See* Ex. G–128, at 5–12 (listing Dr. Sydnor's professional qualifications). Rather to the point of this case, Dr. Sydnor's earliest scholarly work was his award-winning doctoral dissertation, "Totenkopf: A History of the SS Death's Head Division", later published by Princeton University Press as *Soldiers of Destruction: The SS Death's Head Division 1933–1945* (1977).

4. Change of Strength reports were summary personnel records usually prepared monthly to keep an inventory of a particular camp's guards. They listed all of the guards who transferred in and out of the camp in a given month.

5. Troop Muster Rolls were standard printed forms that contained biographical information about each Totenkopf guard—*e.g.*, name, date and place of birth, religion, marital status, mother's name and residence, occupation, and date of induction into the SS. Camp administrators used them to keep track of their personnel.

6. We address the authenticity and admissibility of these documents in Section IV below.

7. We note that Lechner *volunteered* the dates on which Szehinskyj worked on her farm. During the deposition, Judge Alexander Wagenhofer, who conducted the questioning, asked her if "Theo" worked on her farm "in 1942". Lechner responded, "Yes, from February, 1942 until the late summer of that year." Ex. G–25, at 16.

received from the German government every month, gave him his own little room next to her in-laws, and ate her meals with him.[8] She testified that her two-year-old daughter, Isolde, was very fond of Szehinskyj. *See* Ex. G–25 at 55.

Frau Lechner testified in detail about the day in 1942 when Szehinskyj left her farm:

> [H]e just said that he was leaving. He just put his shoes over his shoulder and walked away barefoot. And I watched him leave for a long time. My daughter even waved to him until he was gone.

*Id.* at 56–57. After Szehinskyj left, she received another full-time laborer, named "Rudolf" or "Rudek". *See id.* at 45–46. Frau Lechner stated that she never heard from Szehinskyj after he left in 1942.

Frau Lechner also spoke tearfully about her husband, who was missing in action in Stalingrad as of January, 1943. She stated that she received her last letter from her husband in January of 1943, after Szehinskyj had left her farm, and heard over the radio that same month that the *Wehrmacht* had fallen at Stalingrad.

### B. *Szehinskyj's Case*

Szehinskyj testified at trial that he is not the man named in the documents. He said that he remained on Frau Lechner's farm until November of 1944, through several growing seasons, and that Frau Lechner did not treat him well, did not pay him, did not feed him enough, and made him sleep in a storage room. He remembers Herr Lechner, a German soldier on the Russian front, returning for three weeks in May of 1942. He also claims to remember Herr Lechner sending home a package from the front lines containing a captured Soviet flag in January of 1943, but stated that he did not recall Frau Lechner ever mentioning Stalingrad.

Szehinskyj testified that in November of 1944, he left the Lechner farm with a large band of refugees who passed through and warned him that, if the Russians found him, they would hurt him. He claims that Frau Lechner gave him a blanket, some bread, and his expired *arbeitskarte* as he was leaving. He claims that he had never seen the *arbeitskarte* before that moment.

According to Szehinskyj, he boarded a westbound train in Langenlois, near Schiltern, with the other refugees. When the train could go no further because of bombed-out tracks, he found a bicycle and travelled with two other men from farm to farm looking for food and shelter. He eventually went to the "Duerr" farm in the Straubing area of Germany, where he remained until the end of February, 1945. In April or May of 1945, he met a group of Americans, who transported him to a refugee camp in Vilseck, Germany. In mid-July, he left for Amberg, Germany to work in a sanitarium for people with tuberculosis. In December of 1946 or early 1947, he went to Neumarkt, where he met and married his wife. He returned to Amberg in 1947 to work as a mechanic in the United States Army's motor pool. His daughter, Anna, was born in a displaced persons camp in Amberg in 1948.

Szehinskyj also claims that an injury to his right hand would have prevented him from holding or firing a gun. According to his testimony, the Soviets who invaded Malnow in 1939 put him to work building a railroad, and he pierced his hand when he dropped a scythe on it during the construction. The injury caused him to lose feeling in his right hand and index finger and this prevented him from clenching his hand all the way.

He also stated that he has never had a tattoo.

---

**8.** In fact, she remembers that Szehinskyj loved her sister-in-law's "famous poppy seed noodles." *Id.* at 18.

### III. The Concentration Camp System [9]

Dr. Sydnor testified that concentration camps first came into existence in 1933, when Adolph Hitler and the Nazi Party came to power. As the Nazis tightened control of their growing empire, the use of *Schutzhaft*—"protective detention"—became more and more common. Early in Hitler's reign, the camps were filled in large part with members of political parties thought to be inimical to the Nazi ideology. In the years that followed, the inmate population shifted to those groups thought to be racially undesirable, with the primary focus rapidly turning on the Jews.

The Nazis, under the direction of Hitler, SS Head Heinrich Himmler, and Himmler's protégé, Theodor Eicke, created three basic types of concentration camps under the exclusive control of the SS: confinement and slave labor camps,[10] extermination camps,[11] and, as the war progressed, combined slave labor and death camps.[12] Conditions in the camps were inhuman: disease was rampant, sanitation, medical care, and heat were nonexistent, and inmates received little food, less than 1,000 calories per day. At labor camps, inmates were made to work eleven- or twelve-hour days in brutal conditions, even at night in the bitter winter. Prisoners died every day from malnutrition, exhaustion, disease, beatings, suicide,[13] or murder. Many were subjected to cruel and deadly medical experiments. One such experiment involved inflicting a flesh wound with a poison-tipped bullet and documenting how long it took the prisoner to die from the poison.

In short, the horror of the camps cannot be overstated: they were places of utter, devastating persecution.

As noted above, as the war progressed most inmates were placed in the camps because of their ethnicity or religion, though other groups of inmates included Gypsies, homosexuals, the mentally ill, the homeless, and the unemployed—people the Third Reich regarded as *Untermenschen*, sub-humans.[14] Jews were considered the least desirable and most dangerous of the ethnic groups, followed by Gypsies and Slavs.

As is made clear from the survivor accounts that follow, the Waffen SS Death's Head Battalion guards were vital to maintaining the terror of the camps. Dr. Sydnor testified that the camps simply could not have functioned without them. The guards, who were uniformed, armed, paid, and given leave, were instructed to shoot any prisoner who attempted to escape.[15]

9. Because the nature of the concentration camps is integral to our holding that Szehinskyj "assisted in persecution" within the meaning of the DPA, we discuss it in some detail here.

10. Before the war, this type of camp housed inmates from Germany, primarily opponents of the Nazi ideology. After the start of the war, it included inmates from virtually every country in Europe, as well as some Americans. Flossenbürg was a slave labor camp.

11. At this type of camp, "inmates" were killed upon arrival. Treblinka, Sobibór, Belzec, and Chelmno were extermination camps.

12. At labor/death camps, which became much more prevalent as the war raged on and the outlook for Germany grew bleaker, the Nazis used inmates as free labor for war-related industrial production and literally worked them to death. According to Dr. Sydnor, the regime saw the inmates as a disposable commodity that was easily replaced. Gross–Rosen was a combined slave labor and death camp where the major economic activity was the operation of a granite quarry.

13. Dr. Sydnor testified that prisoners generally committed suicide in one of two ways: by running into a zone of the camp where Totenkopf guards had strict orders to shoot them, or by purposely throwing themselves on the electrified fences surrounding the camps.

14. In fact, the prisoners wore colored patches on their uniforms to indicate their "category"—*e.g.*, pink for homosexuals, violet for Jehovah's Witnesses, black for "asocials", etc. Jews wore yellow and red triangles in the shape of the Star of David.

15. Dr. Sydnor stated that he knows of no case in which a guard was disciplined for shooting without justification, but that a guard could

They subjected inmates to both official and unofficial physical punishments [16] as well as verbal abuse and persecution.

Leaders prescribed specific regulations for executions, such as:

When executing Polish civilian workers and workers from the formerly Soviet area, ... *workers of the same ethnic group in the area are to be led past the gallows after the execution and reminded of the consequences of violating regulations.*

Ex. G–22, at 5 (English translation of January 6, 1943 Implementation Regulations for Executions, issued and signed by SS *Reichsführer* Heinrich Himmler). The regulations specified that "[t]he offender is to be asked whether he wishes to stand facing the wall or the firing squad", *id.* at 2, or, if the inmate is hanged, "[t]he protective detention prisoner is to receive three cigarettes for the execution." *Id.* at 3. The regulations also provided that

be disciplined for failing to shoot when, in the eyes of the Nazis, a situation required it. *See also, e.g.,* Ex. G–5, at 304 (English translation of the 1933 service regulations for the Dachau concentration camp, which later served as a template for all camps and which state that "[w]hoever lets a prisoner escape will be arrested", but a "guard who shoots an escaping prisoner ... will not be punished"); Ex. G–35 (English translation of instructions for SS guards stating that prisoners who attempt to flee or who show signs of getting violent are to be shot immediately).

16. An example of "official" physical punishment was whipping—guards administered twenty-five lashes, which the prisoner had to count out loud. If the prisoner became confused or passed out from the pain, the guard started over. *See* Ex. G–49 (English translation of a Waffen SS circular outlining regulations for whipping punishments and stating that, in certain cases, "the punishment is to be administered to the *naked buttocks*" (emphasis in original)). Whippings were particularly dangerous because prisoners were weakened after the beating, affecting their ability to work. Prisoners who could not work were killed.

"Unofficial" punishments included the "hat game". During marches to off-camp work details, a guard would remove an inmate's

Shortly before the execution, the offender is advised in the presence of the participating SS men by the Camp Commandant or his authorized SS officer that he is to be executed. The notification shall be in approximately the following form:

"The offender has done such and such and thus forfeited his life because of his crime. For the protection of *Volk* and Reich, he is to be dispatched from life to death. Let the judgment be carried out."

*Id.*

All of the guards were armed at all times. An "Instruction on Tasks and Duties of the Guard" circular quotes the General Guard Directive, to wit: "It is forbidden to the guard, unless explicitly determined otherwise, to lay his weapon down." Ex. G–35, at 4. Also, an illustrated instruction book for guards who did not speak German depicts every guard, without exception, holding a gun. *See* Ex. G–34 ("Wrong/Right" picture book).[17]

hat, toss it to the side of the line of prisoners, and order the inmate to retrieve it. When the prisoner did so, the guard would shoot him for trying to "escape".

17. The "Wrong/Right" book concludes after the illustrations with the following manifesto from SS *Gruppenführer* Reinhard Heydrich:

We must work on ourselves. In unprecedented self-discipline we must incorporate into ourselves and follow the eternal principles of the ideology given to us by the Führer. First, we must mentally align ourselves so that everyone thinks the same way about every enemy, that he rejects him right away on principle, without personally making egoistic and sympathetic exceptions. In order to preserve our nation, we must be harsh to the enemy, even at the human risk of hurting an individual enemy and even of being impugned as uncontrolled brutes by some certainly well-meaning people. If we, namely as national socialists, do not fulfill our historical task, because we were too objective and humane, people will still not allow mitigating circumstances in our case. It will merely be said: before history, they did not fulfill their task. If someone is our deliberate opponent, then he is only to be wrestled down as an opponent objectively and without exception. If, for example,

Dr. Sydnor emphasized that Totenkopf guards were not assigned to the same jobs every day at the camps. They had to be able to perform each type of duty-night patrol, escorting inmates to and from work details, guarding them at work, service in the watchtower, patrolling the perimeter of the camp, etc. They also had to be ready at any moment to search for escapees.

The Totenkopf Battalion guards also were used in prisoner transports from one camp to another. On these hellish transports, during which prisoners routinely died, the duty of the guards was the same as at the camps: to make sure no prisoners escaped. Guards surrounded the train cars with guns drawn at every stop. *See, e.g., id.* ("Wrong/Right" illustration book depicting guards with guns pointed at prisoners as they board and exit a boxcar). Conditions for prisoners were abysmal, with no heat, food, or sanitation.

While the Nazi documents and Dr. Sydnor's testimony paint a horrifyingly clear picture of life in the concentration camps, the stories contained in the affidavits of four camp survivors, Exs. G–129—G–132, offer vivid living testimony of what a nightmare a prisoner's daily life was in the camps involved in this case.[18]

Sidney Glucksman, who was twelve years old when the Nazis took him into custody, spent time at three labor camps and was sent to Gross Rosen sometime in 1943. He spent about a year and a half there, performing various back-breaking jobs, until, after a bombing raid, he was forced to march for several days and nights to the camp at Dachau, where he remained for more than a year, until his liberation on April 29, 1945. Mr. Glucksman recounts horrors such as guards who put small children and babies into bags and smashed them against a wall until the children were dead. Inmates were then given the job of separating the bloody clothing from the bodies.

Rudolf Herz spent two months at Auschwitz in 1944 and then was transferred in a railroad boxcar with no food, water, or bathrooms to Schwarzheide, a satellite camp of Sachsenhausen. At Schwarzheide, he spent twelve hours a day doing heavy manual labor, including building bomb shelters and unloading bricks from boxcars. He states that "[t]he work was very hard and the guards ... sometimes beat us if they thought we were working too slow or just because they wanted to beat us." Ex. G–131, at 3. He also notes that the guards treated prisoners "with utter contempt and no respect for [their] dignity as persons," often referring to them as "Jew pig". *Id.* at 4–5. After he was beaten by a guard and severely injured, he was sent to Lieberose, another Sachsenhausen satellite camp. Mr. Herz's life was spared because the doctor at the satellite camp was away for several weeks, during which time he recovered enough to perform light duty work. He spent the fall and winter of 1944–1945 at Lieberose. In February of 1945, the SS was evacuating the camp, so he left on foot along with hundreds of other prisoners on a week-long "death march" to Sachsenhausen. The Totenkopf guards shot many prisoners along the way, and others died from starvation or exposure. After two weeks at Sachsenhausen, he was loaded onto a railroad car and sent to Mauthausen, where he remained until his liberation on May 5, 1945.

Karl Schlessinger was sent to Auschwitz in 1942 and transferred to Warsaw in the fall of 1943. The Totenkopf guards forced him to clean up the rubble in the former Warsaw Ghetto and, during a severe typhus outbreak in the winter of 1943–44,

every German, out of false sympathy, were to make an exception of just this "one decent" Jew or Free Mason from among his acquaintances, then there would simply be 60 million exceptions.

Ex. G–34, at 17.

18. These affidavits were accepted without objection in lieu of the live testimony of these four survivors.

made him work on the construction of a crematorium. In July or August of 1944, as the Red Army advanced toward Warsaw, he was evacuated from the camp and forced to march for six days without water. The guards then placed him in a cattle car and ultimately sent him to Dachau.

Marion Wojciechowski, a former member of the Polish army, was arrested in April of 1942 and sent to Auschwitz, where he remained until he was sent to Gross Rosen in March of 1943. At Gross Rosen, he worked as the prison secretary and then was assigned to a carpenters' detail outside the main camp. He states that, "[w]ith very few exceptions, the SS troops who guarded outside details were regularly cruel in their treatment of prisoners." Ex. G–130, at 3. In February of 1945, he was evacuated in an open freight car to Leitmeritz, in Czechoslovakia. During the two-week trip, armed Totenkopf guards with machine guns were placed between the freight cars. In May of 1945, he and some other prisoners escaped into Czechoslovakia. *See generally* Exs. G–129—G–132.

As the Red Army moved west, the Nazis had to close camps in the East.[19] The camps west of Poland therefore became choked with prisoners, and conditions deteriorated even more, difficult as that may be to believe.

Dr. Sydnor specifically noted that these inhuman conditions, of which we have provided only a flavor, existed at the camps at Gross Rosen, Sachsenhausen, and Warsaw from 1943 through 1945, during Szehinskyj's alleged period of Nazi service. Conditions at Mauthausen and Flossenbürg were no better.

## IV. Szehinskyj's Motion *in Limine*

Szehinskyj filed a motion *in limine* before trial to preclude the admission of some of the Government's documentary evidence. The motion is based on the hearsay, authenticity, and best evidence rules.

The documents to which Szehinskyj objects include the six wartime Nazi documents that identify him as a Totenkopf guard-the Change of Strength reports for May 1943, September 1943, and May 1944, Exs. G–45, G–61, and G–62, the two Troop Muster Rolls, Exs. G–44 and G–63, and the February 13, 1945 Transfer Order, Ex. G–64. He also objects to the admission of three other general categories of documents: (1) judgments in German post-war judicial proceedings; (2) statements of and information relating to other Totenkopf guards; and (3) one set of camp regulations.[20]

### A. *Authentication*

Fed.R.Evid. 901(a) provides that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." As our Court of Appeals has noted, the "burden of proof for authentication is slight." *Link v. Mercedes–Benz,* 788 F.2d 918, 927 (3d Cir. 1986). "[T]here need be only a *prima facie* showing, to the court, of authenticity, not a full argument on admissibility."

---

**19.** Most of the camps were in Poland because of the large numbers of Jews in that region.

**20.** Specifically, Szehinskyj objects to the admission of the following documents: (1) Ex. G 26, the 1941 Service Regulations for Concentration Camps; (2) Ex. G–28, the 1960 judgment in the Matter of Albert Layer; (3) Ex. G–32, the 1962 judgment on appeal in Layer's case; (4) Ex. G–30, excerpts from the judgment in the 1960 trial of Sorge and Schubert; (5) Ex. G–31, the judgment in the 1960 case against August Höhn; (6) Ex. G–51, the judg-

ment from the 1962 trial of Baumkötter; (7) Ex. G–52, a protocol of a 1946 interrogation of Gustav Wegner; (8) Ex. G–59, the 1946 affidavit of Anton Kaindl; (9) Ex. G–71, the statement of Albert Widmann to an Examining Magistrate; (10) Ex. G–72, a continuation of Widmann's 1959 interrogation; (11) Ex. G–56, a wartime service card for Adalbert Kotsch; (12) Ex. G–107, Kotsch's May 11, 1979 statement; and (13) Ex. G–87, the 1972 interrogation of Simon Kellinger.

*Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1375 (3d Cir.1991) (quotation omitted).

Under Fed.R.Evid. 901(b)(8), the "ancient document rule",

> Evidence that a document or data compilation, in any form, (A) is in such condition as to create no suspicion concerning its authenticity, (B) was in a place where it, if authentic, would likely be, and (C) has been in existence 20 years or more at the time it is offered [is sufficient to authenticate a document under the rule].

█ Although this rule requires that the document be free from suspicion, that suspicion goes not to the content of the document but rather to whether the document is what it purports to be. *See United States v. Kairys*, 782 F.2d 1374, 1379 (7th Cir.1986) ("[T]he issue of admissibility is whether the document is a *Personalbogen* from the German SS records located in the Soviet Union archives and is over twenty years old. Whether the contents of the document correctly identify the defendant

goes to its weight and is a matter for the trier of fact; it is not relevant to the threshold determination of its admissibility."); *see also United States v. Stelmokas*, 100 F.3d 302, 312 (3d Cir.1996).

### 1. *The Six Documents that Identify Szehinskyj*

These six documents come from three different archives. The three Change of Strength Reports and the Transfer Order are from the Center for the Preservation of Historical Documentary Collections in Moscow.[21] The September 29, 1943 Troop Muster Roll was prepared at Sachsenhausen and found in the Central State Archives of Ukraine, located in Kiev. And the May, 1944 Troop Muster Roll was found in the German Federal Archives in Berlin.

Dr. Sydnor, whose knowledge on this subject is encyclopedic,[22] testified that there is nothing unusual about any of these documents.[23] All of them are consistent with the content of other Nazi records of the era,[24] all were found in locations where

---

**21.** Dr. Sydnor testified that after the war, the Soviet Army captured quantities of German documents and brought them back to Moscow, intending to use them to find subjects for prosecution for war crimes. Most (if not all) of these documents first became available to Western scholars after the fall of the Soviet Union in 1991.

**22.** It should be noted that Dr. Sydnor's expertise also includes his primary research and knowledge of the various archives around the world that contain documents such as those he testified about in this case. Those archives include: "the National Archives in College Park, Maryland, Washington, D.C., and Suitland, Maryland, which contain captured German records and U.S. war crimes investigative records; the Federal Archives (*Bundesarchiv*) in Koblenz, Germany, and the Federal Military Archives (*Bundesarchiv–Militärarchiv*), one of its branches, in Freiburg, Germany; the former Berlin Document Center, the repository of Nazi Party and SS personnel records; the Central Office of the State Judicial Administrations for the Investigation of National Socialist Crimes, in Ludwigsburg, Germany, which maintains records of German investigations and trials concerning Nazi crimes; the museums of Dachau

Concentration Camp, Auschwitz Concentration Camp, and Mauthausen Concentration Camp; and the library and archives of the Museum of the Ghetto Fighters House (Beit Lohamei Hagetaot) and the Yad Vashem Archives in Israel." Ex. G–128 at 11–12 (Qualifications).

**23.** We note that Dr. Sydnor's conclusion is consistent with that of Dr. Raul Hilberg, another distinguished scholar of the Nazi era, in *Stelmokas*. *See* 100 F.3d at 312.

**24.** Dr. Sydnor noted that consistency among unrelated documents dramatically increases his, and other historians', confidence in their authenticity.

For example, the name "Adalbert Kotsch" appears along with that of Szehinskyj on the May, 1943 Change of Strength Report, ex. G–45 (listing a transfer from Gross Rosen to Sachsenhausen) and the September, 1943 Change of Strength Report, ex. G–61 (listing a transfer from Sachsenhausen to Warsaw). Kotsch's camp personnel card, ex. G–56, is consistent with the information on these Change of Strength Reports, as well as with his sworn statement to judicial authorities on May 11, 1979 in then-West Germany. Ac-

they were likely to be,[25] and the form of each is consistent in every way with the document being an unaltered original. He also points out that it would have taken a vast conspiracy to alter the documents, since they were located in different archives and contained information about many different Totenkopf members. He notes that it would have been impossible for the Soviets to anticipate fifty years ago that a person would be the subject of litigation in 2000, and there is no indication that the documents were ever used by Soviet prosecutors or investigators. And he flat-footedly states that there is no evidence of the Soviets ever falsifying a document to implicate a Ukrainian living in relative obscurity in North America.[26]

■ Based on this extremely strong expert opinion, we without hesitation hold that the six Nazi wartime documents are

properly authenticated under Rule 901(b)(8).[27] Dr. Sydnor emphasized that the condition and location of the documents are completely free from suspicion, and there can be no dispute that they are more then twenty years old. Furthermore, Szehinskyj has offered nothing more than pure speculation in his attempt to cast doubt on the documents—an unfounded allegation that the Soviets tampered with them, which Dr. Sydnor carefully and thoroughly proved wrong. We therefore reject Szehinskyj's challenge to the authenticity of these six Nazi wartime documents.[28]

### 2. *The Remaining Documents*

The remaining documents are admissible under Rules 901(b)(8) and 902. With respect to the judgments of the German courts,[29] all are admissible under Rule

cording to Dr. Sydnor, this consistency among unrelated sources strengthens his confidence in the authenticity of the documents and in the reliability of the information about Szehinskyj.

Dr. Sydnor testified to the same effect with respect to Wolodmir Sapotockyj and Simon Kellinger, other former guards whose names appear with Szehinskyj's on the change of strength reports and, in Sapotockyj's case, the transfer order.

**25.** For example, Dr. Sydnor testified that the September 29, 1943 Troop Muster Roll was likely to be found in the Ukraine, as Szehinskyj himself is Ukrainian.

**26.** In fact, there is no evidence of Soviet falsification even in cases where it would be much more understandable, if no less unethical, for them to have done so. Dr. Sydnor testified that the Soviets had custody of Himmler's office calendar for 1941 and 1942, an historical trophy which came to light after the Soviet Union collapsed. The calendar lists who Himmler saw and what they discussed. According to Dr. Sydnor, if the Soviets had fabricated anything, it would have been this, as a way of causing huge embarrassment in the West during the Cold War (*e.g.*, during the struggle over the installation of U.S. Pershing missiles in West Germany in the 1980's). However, there is no evidence whatsoever of any such sort of Soviet falsification.

**27.** The Government also may be able to authenticate the documents under Rule 902, which deals with self-authenticating public documents. However, because of our holding above, we will not consider this issue.

**28.** The words of our Court of Appeals in *Stelmokas* apply with equal force here:

We cannot conceive that any rational person would believe that someone set out to incriminate [the defendant] and planted fake documents in widely-scattered places for that purpose. If anyone created the documents to injure [the defendant], the fabricator most peculiarly placed the bulk of the documents in a location where they were not accessible to the public and from which, in fact, they were not released for decades. There certainly is no evidence in the record that anyone hatched such a bizarre plot.... [The defendant] was hardly a prominent figure in the war and it is difficult to conceive why someone would go to the lengths he suggests in order to frame him. [Defendant's] attack on the authenticity of the documents is not substantial.

100 F.3d at 313.

**29.** The court documents-Government's exhibits 28, 30, 31, 32, and 51—are all from what were West German sources. G–30 is from Bonn, G–28 and G–32 are from the Central Office of the State Judicial Administrations in Ludwigsburg, and G–31 is from Düsseldorf.

902(3), dealing with self-authenticating foreign public documents, as all have the necessary apostilles. *See also* Fed. R.Civ.P. 44(a)(2). Furthermore, Dr. Sydnor testified that he believes that these are authentic copies of German court documents, that historians have relied extensively on them, and that no one has ever questioned their authenticity (and that there is no reason to do so). Thus, we also conclude that the court records are admissible under Rule 901(b)(8).

■ With respect to the statements and interrogations of other Totenkopf guards and the service card of Kotsch (Gov't Exs. 52, 56, 59, 71, 72, 87, and 107),[30] these documents clearly are admissible under Rule 901(b)(8), as there is nothing about them that is in any way suspicious and historians use them routinely without questioning their authenticity. In fact, one of these was used as a Nuremberg document, *see* Ex. G–59.

■ Finally, with respect to Exhibit G–26, the 1941 manual of service regulations for concentration camps,[31] Dr. Sydnor again testified that he has no doubt about the authenticity of the document and that no historian has ever called it into question. We therefore find it authentic under Rule 901(b)(8).

## B. *Hearsay and Best Evidence Objections*

■ Szehinskyj argues that the offending documents are inadmissible hearsay. Included in his hearsay objection is a complaint that we have only been shown copies of the objected-to documents. However, under Fed.R.Evid. 1003, a "duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2)

in the circumstances it would be unfair to admit the duplicate in lieu of the original." As noted above, Szehinskyj has failed to raise a "genuine" challenge to the authenticity of the original documents. And it can hardly be argued that it would be "unfair" to admit the copy instead of the original, as the originals of most of these documents are more than fifty years old, in extremely delicate condition, and held under lock and key in various nations' archives. We therefore overrule any best evidence challenges to the admissibility of all of the documents.

■ We also overrule Szehinskyj's hearsay challenges to the documents, as they clearly are admissible under several exceptions to the hearsay rule. For example, Rule 803(16) provides an exception for "statements in a document in existence twenty years or more the authenticity of which is established." All of the objected-to documents are at least twenty years old, and we already have ruled that their authenticity has been established; thus, there is no doubt that they are admissible under this exception. *See Stelmokas,* 100 F.3d at 311–12 (holding that World War II-era documents from Lithuanian archives that demonstrated the defendant's employment and activities during World War II were admissible under Rule 803(16)).

■ Also, many of the documents (including the six documents that identify Szehinskyj, the regulation manual for concentration camps, and the service card of Kotsch) are admissible under Rule 803(6) as business records. That rule provides that

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made

---

G–51 is a West German judicial judgment from the State Court of Münster.

**30.** Exhibits 71, 72, 87, and 107 are from the Central Office of the State Judicial Administrations in Ludwigsburg. Exhibit 52 is from the State Attorney's Office in Köln, West Ger-

many. And Exhibit 26 is from the Central State Archive of the October Revolution in Moscow.

**31.** This document is also from the Central State Archive of the October Revolution in Moscow.

at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of . . . [a] qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Dr. Sydnor testified at length about how the documents are akin to business records, in particular the personnel records of any large organization. He stated that they were necessary in order for the camps to function properly and outlined the circumstances surrounding their creation. We therefore overrule Szehinskyj's hearsay objection on this alternative ground.

Many of the documents also are admissible under Rule 803(8), which provides for the admission of certain public records and reports. For example, the court documents fit within this exception.

Finally, the documents are admissible under Rule 807, the general catchall hearsay exception, as all experts agree that they are highly reliable.

For all of these reasons, we will deny Szehinskyj's motion *in limine* in its entirety.

## V. Legal Basis for Denaturalization

### A. *The Government's Burden of Proof*

As our Court of Appeals has noted, two "competing concerns" govern our review of this matter. *See Breyer,* 41 F.3d at 889. On the one hand, because "the right to

acquire American citizenship is a precious one, and . . . once citizenship has been acquired, its loss can have severe and unsettling consequences," the Government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." *Fedorenko v. United States,* 449 U.S. 490, 505, 101 S.Ct. 737, 746, 66 L.Ed.2d 686 (1981) (internal quotation omitted). The evidence for revocation must be "clear, unequivocal, and convincing" and not leave "the issue in doubt." *Id.* (internal quotation omitted).

■ On the other hand, there must be "strict compliance" with the Congressionally imposed requirements for naturalization, and the failure to comply with any such requirement renders the naturalization illegally procured and subject to revocation under Section 1451(a) of the Immigration and Nationality Act. *See Fedorenko,* 449 U.S. at 506, 101 S.Ct. at 747; *see also Breyer,* 41 F.3d at 889.

### B. *The INA and the DPA*

■ Szehinskyj, along with his wife and young daughter, entered the United States on November 24, 1950 under an immigrant visa issued to him pursuant to the DPA. *See* Ex. G–133 (Szehinskyj's immigration file). Section 13 of the DPA provides that:

No visas shall be issued . . . to any person . . . who advocated or assisted in the persecution of any person because of race, religion, or national origin. . . .

The Government contends that because of Szehinskyj's service as a Totenkopf concentration camp guard, he was not eligible for a visa under the DPA. Thus, because he was not lawfully admitted[32] to this country, he was not eligible for naturalization. *See* 8 U.S.C. § 1427(a)(1).[33]

---

**32.** Lawful admission requires a valid immigrant visa. *See Fedorenko,* 449 U.S. at 515, 101 S.Ct. at 751; *Breyer,* 41 F.3d at 889.

**33.** This provision of the INA states that:
No person . . . shall be naturalized unless . . . immediately preceding the date of filing his application for naturalization has resid-

ed continuously, *after being lawfully admitted for permanent residence,* within the United States for at least five years
8 U.S.C. § 1427(a)(1) (emphasis added).

Our resolution of this matter therefore turns on whether Szehinskyj, as an alleged armed concentration camp guard, "assisted in the persecution of any person because of race, religion, or natural origin."

### C. Assistance in Persecution

██ In *Fedorenko,* the Supreme Court addressed the DPA's locution "assisted in ... persecution" in the denaturalization case of a Nazi concentration camp guard. The Court clarified that voluntary service is not necessary, nor is personal participation in atrocities. *See id.,* 449 U.S. at 512, 101 S.Ct. at 750. In the frequently cited footnote thirty-four of the Court's opinion, Justice Marshall wrote that:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians.

*Id.,* 449 U.S. at 512, 101 S.Ct. at 750. Many courts, including our Court of Appeals, have held that service as an armed concentration camp guard qualifies as assistance in persecution. *See Breyer,* 41 F.3d at 890 (holding that defendant, who served in the Waffen SS as an armed concentration camp guard, assisted in persecution under Section 13 of the DPA and stating that such assistance "does not require willing and personal participation in atrocities"); *United States v. Hajda,* 135 F.3d 439 (7th Cir.1998) (affirming the district court's decision that an armed guard at Trawniki and Treblinka assisted in persecution); *United States v. Schmidt,* 923 F.2d 1253, 1259 (7th Cir.1991) (holding that a member of the Death's Head Battalion who served as an armed, uniformed guard at Sachsenhausen assisted in persecution); *Kairys,* 782 F.2d at 1377 n. 3 (holding that a prisoner of war who was recruited to serve as a guard at Treblinka assisted in persecution); *United States v. Hutyrczyk,* 803 F.Supp. 1001, 1009–10 (D.N.J.1992) (holding that an armed guard at a labor camp assisted in persecution).

### VI. Szehinskyj's Assistance in Persecution

### A. The Documents

The six Nazi wartime documents that mention Szehinskyj are clear, unequivocal, and convincing evidence that he assisted in persecution within the meaning of the DPA. As we note below, they are perhaps the most reliable evidence possible, since they, unlike memories, have not faded with time.

Each of the six documents identifies Szehinskyj not only by name, but also by at least one other identifying characteristic. *See generally* Ex. G–123 (the "points of corroboration" chart). The Change of Strength Reports and the Transfer Order list Szehinskyj's first and last name, rank (*Schütze,* or private), and date of birth (February 14, 1924). *See* Exs. G–45, G–61, G–62, and G–64. The September 29, 1943 Troop Muster Roll lists his first and last name, rank, date of birth, place of birth (Malnow, in the Lvov District of Poland), religion (Greek Catholic), marital status (single at the time), mother's name and address (Paraskewia Szehinski, Malnow, Lvov District), occupation ("Cobbler/Agricultural laborer"), date of induction into the Waffen SS (January 15, 1943), SS transfer and unit information, and a personal description (170 cm. tall, slender build, dark blond hair, grey-green eyes, "normal" nose, no beard, no marks, and a broken German dialect). *See* Ex. G–44. The second Troop Muster Roll, completed sometime after May 4, 1944, lists the same first and last name, rank, date and place of birth, religion, marital status, and name and address of mother. It lists Szehin-

skyj's occupation only as "cobbler". *See* Ex. G–63.

These documents not only are consistent with one another, they are consistent with the information Szehinskyj provided to the Displaced Persons Commission ("DPC") and the United States when applying for a DPA visa and for naturalization. For example, he stated in his application to the DPC that he was born on February 14, 1924 in "Mavniw, Poland",[34] and that his occupation was farmer. *See* Ex. G–133, at 28. The certificate of birth and baptism attached to his application lists his mother's first name as "Parasceva". *See id.* at 33.

Furthermore, the documents are consistent with Szehinskyj's trial testimony and with the facts to which he has stipulated, to wit, that: (1) he was born on February 14, 1924 in Malnow, Poland; (2) his mother's first name was Parasceva, and she lived in Malnow; (3) he is a Byzantine Catholic, which is also called Greek Catholic; (4) he worked as a farmer; (5) a man he met on a train told him to identify himself as a cobbler to avoid farm work;[35] and (6) he was married after the war, in 1947. Also, much of the physical description in the documents matches Szehinskyj's characteristics, *e.g.*, height,[36] build,

hair and eye color, and absence of "marks".

The documents also are consistent with Szehinskyj's Nazi-issued *arbeitskarte, see* Ex. G–24, which he brought with him to his deposition and which on its face expired on January 31, 1943. Dr. Sydnor testified that it would have been extremely dangerous for Szehinskyj to be found with an expired *arbeitskarte* since, during the Nazi regime, a person found without valid "papers" had no identity or would be deemed a contract-breaker, both of which could result in incarceration in a concentration camp. As Dr. Sydnor stated, this threat of punishment was a "powerful incentive for workers to legitimize themselves".[37] Given the life-and-death stakes, it is implausible to accept the notion that Szehinskyj simply would have ignored the fact that he needed an *arbeitskarte* or the expiration date on it.

Szehinskyj makes much of the fact that there is no live evidence in this case—for example, no camp survivors have identified him as a former Totenkopf guard. Given that more than fifty years have passed since the Third Reich's demise, Szehinskyj obviously looks quite different now than he did at age nineteen—as a comparison with his photograph from 1958 on his certificate

---

34. A common spelling of "Malnow".

35. This fact, in particular, casts serious doubt on any contention that Szehinskyj was the victim of identify theft, as it effectively limits to a group of one the persons who could have committed the theft, *i.e.*, the other party to the conversation. Szehinskyj never actually worked as a cobbler.

36. The Troop Muster Roll lists his height as 170 centimeters. Various documents in his immigration file list his height as five feet, eight inches, or sixty-eight inches. Sixty-eight inches converts to 172 centimeters.

37. In response to Szehinskyj's suggestion that such risks were not generally known, Dr. Sydnor pointed out that, while some of these Nazi policies were intended to be secret, they did become widely known through the "grapevine." For example, he noted that the term "Final Solution", which was intended to be classified, quickly found its way into ordinary

German discourse after the infamous Wannsee Conference that Reinhard Heydrich, Himmler's deputy and head of the Reich Security Main Office, convened on January 20, 1942. The reliability of this grapevine was shown when the very locution "Final Solution" found its way in letters between ordinary German civilians shortly after January 20, 1942.

There is no doubt that Szehinskyj was aware of the importance of maintaining a valid *arbeitskarte*, as he testified that, before leaving the labor office in Krems, an official explained the rules and regulations of his situation to him. Dr. Sydnor also testified that Eastern workers, during the registration process, were told in no uncertain terms about the importance of the *arbeitskarte*. And as its possession or lack thereof was matter of life or death in the Third Reich, it is inconceivable that anyone would move about this police state without valid "papers".

of naturalization shows—and we would be most skeptical of any eyewitness who would point a finger at Szehinskyj in an American courtroom in 2000.

We also note that the fact that some of the documents spell Szehinskyj's name differently [38] is accounted for in the record, through Szehinskyj's own admissions and stipulations. The "agreed facts" section of the Joint Pretrial Stipulation quotes Szehinskyj's deposition, at which he stated that "It's now spelling in Europe, that's the whole problem, just pronunciation, and they write what they want." Joint Pretrial Stip. at 23. He was referring to the fact that Ukraine uses the Cyrillic alphabet, which differs markedly from our own Latin alphabet. Furthermore, his own documents show that he signed off on Latinized spellings of his name. See, e.g., Ex. G–124, Tab 2 (Szehinskyj's's Prepatory Commission—Internal Refugee Organization ("PCIRO") application for assistance, which he has admitted to signing and which spells his name "Fedor Szehinski"). And he has stipulated that the post-war documents that contain various spellings of his name apply to him. Thus, the fact that the documents contain different spellings of "Szehinskyj" is of no moment.

In short, we have no doubt that the Theodor Szehinskyj mentioned in these six Nazi wartime documents is our defendant.

### B. *Frau Lechner's Testimony*

Both parties agree that Szehinskyj spent time on the Lechner farm. The Government, however, claims that he left that farm before January of 1943, while he claims to have remained there until November of 1944.

We have read the English language transcript and viewed the videotape of Frau Lechner's *de bene esse* deposition. *See* Ex. G–25. As an initial matter, we note that Frau Lechner was a completely credible witness and was remarkably exact in her answers. She has a precise recollection of dates. For example, she recalled the date on which her husband left for the army (October 5, 1940) and the time he took a vacation in 1942.[39] We credit her testimony in its entirety.

Frau Lechner's testimony simply does not support Szehinskyj's story. She testified that Szehinskyj worked on her farm "from February, 1942 until the late summer of that year." *Id.* at 16; *see also id.* at 20 ("I didn't want to hold him back, but I had to get another laborer because Theo wanted to go"); *id.* at 22 ("[H]e was no longer there in 1943. I had another Pole to help me"); *id.* at 23 (stating that she never saw Szehinskyj after 1942). At least eleven times during her deposition, Frau Lechner stated that Szehinskyj left her farm after the harvest in 1942. As we noted above, she first volunteered the dates on which Szehinskyj worked on her farm, and she remembers that his replacement was "Rudolf" or "Rudek", "another Pole".[40]

Also, as noted above, Frau Lechner remembers the specific details of Szehinskyj's departure, including the fact that he walked away with his shoes over his shoulder. If Szehinskyj had left the farm in November, as he testified, instead of the late summer, as Frau Lechner remembers, it is unlikely that he would have walked away barefoot through the chilly Austrian mountain countryside. Szehinskyj himself testified that the high-altitude Schiltern

---

**38.** For example, the May, 1944 Troop Muster Roll lists his name as "Szehinski", while the Change of Strength Reports list it as "Szehinsky".

**39.** While there is some ambiguity in the transcript about the date of her husband's return home on leave, this is removed on page twelve. *See* Ex. G–25, at 12.

**40.** Frau Lechner actually remembers all of the workers on her farm during the war years. She first had laborers from the Hitler Youth who helped during busy harvests, then Szehinskyj, then "Rudolf" or "Rudek", and finally Rene, a Frenchman.

area often had snow on the ground in October.

It is also noteworthy that Szehinskyj testified that he never discussed the Battle of Stalingrad with Frau Lechner, though she repeatedly (and very emotionally) states in her deposition that her husband was missing in Stalingrad as of early 1943. According to Szehinskyj, during 1943 Frau Lechner complained about not receiving letters from her husband and worried that he was "kaput", but never mentioned Stalingrad to him. It is inconceivable to us that Frau Lechner would have failed to mention Stalingrad during these conversations about her husband's whereabouts, as the place clearly is synonymous to her with her husband's untimely death. Indeed, she mentioned that city eleven times during her deposition, as though she defines her wartime experience through the shorthand of "Stalingrad". Thus, Szehinskyj could not have been on the Lechner farm after January of 1943, when Frau Lechner learned about the loss at Stalingrad and its consequence to her.

Frau Lechner testified that the mayor of Schiltern, Josef Maurer, registered her with the Krems labor office so that she could receive a worker. Dr. Sydnor testified that a benefactor such as Maurer, who had to have been appointed or at least approved by the Third Reich and be a member of the Nazi Party, most likely would have had no trouble renewing an expiring *arbeitskarte*. In fact, if Maurer had a telephone, he could have done it with a simple phone call.[41] Thus, it is inconceivable that Frau Lechner risked her own safety, as well as Szehinskyj's, by letting the card lapse.

There is simply no reason to believe that, nearly sixty years after she last saw Szehinskyj, Frau Lechner perjured herself in sworn testimony before a judge merely to hurt Szehinskyj. There is no evidence

in the video of any animus whatsoever toward Szehinskyj. In fact, she stated that she treated him as a member of her family.

Finally, we note that Szehinskyj is the one who brought Frau Lechner into this case. It was he who supplied her name to the Government as an alibi from his very first filing after the war to his sworn statement in 1997. Thus, any contention that Frau Lechner is out to get Szehinskyj is completely unfounded.

Szehinskyj has attempted to cast doubt on Frau Lechner's testimony by arguing that she does not want to be forced to compensate him for his slave labor on the farm. There is no evidence at all in the record to substantiate this speculation, and Szehinskyj's counsel did not question Frau Lechner about this subject during the deposition. Also, Szehinskyj admitted on his PCIRO application Frau Lechner *did* pay him-he stated that he received thirty *Deutschmarks* a month for his services on the farm from February of 1942 through March of 1945 (though he testified at trial that he received nothing), *see* Ex. G–124, tab 2.[42] Thus, Frau Lechner's hypothesized bias is a figment of advocacy.

In sum, Frau Lechner's testimony is unwittingly self-corroborative, and we accept all of it.

## C. *Szehinskyj and His Testimony*

In addition to the compelling evidence discussed above, which by itself would suffice to find that Szehinskyj served in the Totenkopf, we also find support for our decision from Szehinskyj himself.

First, Szehinskyj testified that he could not hold or fire a gun because of the 1939 scythe injury to his right hand. However, he admits to performing all kinds of manual labor after the alleged 1939 accident, including farm work, wood chopping

---

**41.** Provided, of course, that there were no questions about or problems with the laborer at issue.

**42.** Frau Lechner recalled that she paid him the forty *Deutschmarks* a month she got from the Reich. Ex. G–25 at 17.

(which required him to use an axe), and serving as a United States Army mechanic (which required him to operate stick-shift vehicles with his right hand). He also served as a policeman at displaced persons camps at Vilseck, Amberg, and Neumarkt in the years after the war and as a guard on the *S.S. General Sturgis*, the ship on which he travelled to America.[43] When he arrived in the United States, he again served as a farm worker and admits to driving a tractor with a rifle on the back. After that, he worked as a mechanical technician for the General Electric Company and had to use screwdrivers and adjustable wrenches. He admitted that he could do little of this with his left hand. Also, in his application to file a petition for naturalization, he stated that he would be willing to "bear arms" on behalf of the United States. *See* Ex. G–133, at 9.

If the foregoing were not enough to refute Szehinskyj's contention that he could not hold a gun, we also have a statement from an American doctor who examined Szehinskyj in connection with his applications for naturalization. The report of Dr. Kehl states that his examination did not reveal evidence of any "physical defect which might affect [Szehinskyj's] ability to earn a living". Ex. G–133, at 32. As Szehinskyj was indisputably a manual worker, Dr. Kehl's report is solid evidence that our defendant was able to use at least one hand with dexterity.[44]

Second, there are many internal inconsistencies in Szehinskyj's testimony. For example, he testified repeatedly on direct examination that he never saw his *arbeits-*

*karte* before Frau Lechner gave it to him upon his departure in late 1944. On cross-examination, however, he admitted that he signed the card in 1942, at the Krems labor office. He also, at several points during cross-examination, attempted to disavow his own documents, for example by denying that he signed his application for assistance to the PCIRO, Ex. G–124, tab 2. His attorney had to correct his testimony by stipulation after a recess. Szehinskyj testified that Frau Lechner did not treat him well, but later on he stated that she gave him a blanket and a large piece of bread when he left the farm. And he stated on the PCIRO documents that he left the Lechner farm in February or March of 1945, *see, e.g.,* Ex. G–124, tab 2, but he told us last week that he left in November of 1944. These many inconsistencies, of which we have mentioned only a few, cast doubt on all of Szehinskyj's testimony.

Third, Szehinskyj's story regarding his extensive travel throughout the Third Reich with an expired *arbeitskarte* after leaving the Lechner farm in November of 1944 is completely incredible. Dr. Sydnor testified that without valid papers, a person had no identity and thus was likely to land in a concentration camp after being stopped by the Gestapo (a regular occurrence). *See, e.g.,* Ex. G–18 (a document, dated one month before Szehinskyj joined the Totenkopf, from the chief of the Gestapo authorizing the incarceration of an additional 35,000 people, including those who broke labor contracts, *i.e.,* had invalid work papers).[45] An invalid *arbeitskarte*

---

**43.** The very fact that Szehinskyj, supposedly for the first time in his life, worked as a policemen or guard almost immediately after the documents demonstrate his SS service coming to an end is further support for the Government's claims. The logical inference is that Szehinskyj found work that was benignly similar to what he had done for the Waffen SS for over two years.

**44.** While it is true, as Dr. Sydnor testified, that the SS required its guards to be in good physical condition, Szehinskyj had every in-

centive to downplay any injury to his hand, as he could greatly improve his situation if he were accepted into the SS. On the other hand, Szehinskyj would have benefitted from any *slight* impairment, since Dr. Sydnor testified that Totenkopf men in the best physical condition were sent to the front.

**45.** Incidentally, Dr. Sydnor testified that, after this memorandum was issued, there was an increase in the number of Eastern European guards.

was evidence that the person had broken a labor contract, another "crime" that could result in camp imprisonment and death. Particularly during the last phase of the war, being caught without valid papers was "lethal", according to Dr. Sydnor, as control over the movement of people tightened even further and roving groups of security forces conducted summary courts-martial and executions of those whose papers were not in order. Dr. Sydnor stated without qualification that if one was in an area under the Third Reich's authority without valid papers, one took one's life in one's hands. He also noted that this danger was (understandably) well-known· to the populace.

It is also implausible that Szehinskyj found people who would employ him with expired papers. To have done so would have exposed employers to the risk of punishment at the hands of the Reich's ubiquitous security forces.

Just as incredible is Szehinskyj's contention that he never saw his *arbeitskarte* until the day he left the Lechner farm, since he testified that he made occasional trips off of the farm both with and without Frau Lechner. Given the Gestapo's practice of stopping pedestrians, demanding to see their "papers", and arresting them if the papers were not satisfactory, it would have been virtual suicide for Szehinskyj to leave the farm without valid identification.

Fourth, Dr. Sydnor testified that members of the Totenkopf were given a small tattoo indicating their blood type at the base of their bicep on the underside of their left arm. He also stated that it was common for Totenkopf members to have former SS doctors remove their tattoos as soon as possible after the war, as a tattoo would have been proof positive of their activities during the Third Reich. During an *in camera* inspection of Szehinskyj's left arm, we discovered that he has a ⅜ inch long scar on his left arm, just above his elbow. The scar, which clearly is not the result of an incision, is large enough to have contained the one or two letters of Szehinskyj's blood type.

Finally, though he tried to deny it during his testimony, Szehinskyj reported to the PCIRO in March of 1948 that, between March and November of 1945, he was a farm worker in Schönsee, Germany. *See* Ex. G–124, tab 2. The parties have stipulated that Schönsee is seventeen miles from Flossenbürg, which the Government's documents demonstrate is where Szehinskyj ended up after the prisoner transport to Mauthausen in February of 1945. Szehinskyj has thus placed himself only miles from where the Government claims the Nazis transferred him when the war in Europe neared its end, thereby unwittingly corroborating the Government's account and, more particularly, Exhibit G–64.[46]

Szehinskyj has attempted to raise as a defense the possibility that someone may have stolen his identity during the war years. He testified about various conversations he had with different people, for example a conversation with another kidnapped laborer on the train to Krems. We reject this argument based on the sheer volume of biographical data about Szehinskyj contained in the documents. It is implausible (to say the least) that an identity thief gathered enough information (all of it correct) about Szehinskyj during one of these conversations to fool the Naz-

---

**46.** Szehinskyj told the PCIRO that he began work in Schönsee in March of 1945. Dr. Sydnor stated that, although it is not entirely clear when Flossenbürg was liberated, it most likely was emptied in April of 1945. This discrepancy can be explained in several ways. Szehinskyj could have falsified the date on the PCIRO form, or it could simply be a mistake. Also, Dr. Sydnor testified that some Totenkopf guards deserted as the end of the war approached when it became clear that the Allied forces would treat any captured Waffen SS soldiers harshly (in large part because of the Allies' horror at the concentration camps they stumbled onto in April of 1945). In any event, this minor discrepancy does not create a moment of doubt when compared to the mountain of evidence confirming Szehinskyj's Nazi service.

is. It is even more implausible to believe that this thief also matched Szehinskyj's precise physical description.

We also reject the argument that even if Szehinskyj is the man named in the documents, there is no evidence that he himself did anything wrong. This contention misses the point of Section 13 of the DPA. Even if Szehinskyj never physically harmed a camp inmate (an unlikely prospect, given the horrific camp regulations and practices discussed above), his very role at the camp was to assist in persecution. He was a guard, and his job was to prevent inmates from escaping. This is enough to "assist" in persecution.

 We therefore without hesitation conclude that our defendant is the Theodor Szehinskyj mentioned in the Nazi documents as an armed Totenkopf concentration camp guard. By definition, the Totenkopf assisted in persecution of Jews and others considered racially inferior or "defective". The concentration camp guards all carried guns and were under strict orders to use them. Thus, we find that Szehinskyj was not eligible for a visa under the DPA, *see, e.g., Fedorenko,* 449 U.S. at 512, 101 S.Ct. at 750; *Breyer,* 41 F.3d at 889–90, and thus he could not have been lawfully naturalized in 1958.

## VII. Time's Rude Hand

Fifty-five years is a very long time in one man's life. This is the span since the last Nazi concentration camp closed and this trial began. Given how far this case takes us into the past, some may well criticize this prosecution (to say nothing of this decision) based on the sheer passage of time alone.

Notable among such critics is Judge Ruggero Aldisert, of our Court of Appeals, who dissented in *Stelmokas.* Though noting in that dissent his service in World War II and his abhorrence for the atrocities of the Third Reich, Judge Aldisert

nevertheless was profoundly troubled by the due process implications of the extraordinarily long time between the events of the Nazi regime and the institution of an action much like the present one:

> In American jurisprudence there is no analogue to permitting a trial on events that occurred a half-century in the past. Indeed, with the exception of murder cases, all criminal and civil proceedings are rigorously circumscribed by fixed statutes of limitations. Such statutes preclude the institution of criminal or civil complaints after a finite number of years. Similarly, in equity petitions, stale actions are barred by the doctrine of laches.
>
> The policy that undergirds our statutory and judicial limitations on such actions is rooted in an understanding that with the passage of time, witnesses disappear and memories fade. Such a policy reflects appreciation for the reality that, because our memories are fragile and inevitably compromised by the ravages of time, at some point they can no longer be considered trustworthy for presentation under oath as "the truth, the whole truth and nothing but the truth." ...
>
> Given contemporary concepts of due process, it is doubtful that one could be tried in 1996 for a murder that took place in 1941. Nevertheless, the judiciary continues to permit the prosecution of stale denaturalization cases like this one.

*Stelmokas,* 100 F.3d at 342–43.[47]

Notwithstanding the force of Judge Aldisert's due process objections, there are at least three answers to his concerns, one rooted in the particulars of Szehinskyj's case, and two others rooted more generally.

As applied to Szehinskyj, Judge Aldisert's legitimate concern that "our memories are fragile and inevitably compromised by the ravages of time", *id.* at 342, simply does not apply. If the record

---

**47.** Szehinskyj did not raise a due process objection, but asserted laches as an affirmative defense. He did not, however, mention this defense at trial.

against Szehinskyj were based solely on, say, eyewitness testimony, Judge Aldisert's concern would be especially troubling.[48] As is by now clear, however, nothing in this prosecution depends on anyone's live memory. Szehinskyj has been convicted by incontrovertible documents, all but one of which did not see the light of Western eyes until after the collapse of the Soviet Union on December 31, 1991. These wholly consistent ancient documents, having reposed for over fifty years in Moscow, Kiev, and Berlin, leave no doubt that this Theodor Szehinskyj was a member of the Totenkopf battalion at the Gross Rosen, Sachsenhausen and Warsaw concentration camps, and almost certainly at Mauthausen and Flossenbürg as well. From January of 1943 through at least April of 1945, Szehinskyj was thus part of the Totenkopf guard in at least three venues of the Final Solution.

Ironically, the one live witness who might have supported Szehinskyj's alibi did quite the opposite. Frau Lechner's exact recollection of the years in question effectively confirms the significance of the January 31, 1943 expiration date on Szehinskyj's *arbeitskarte*. Had Frau Lechner not lived, her absence would have provided Szehinskyj with the claim that time took his alibi witness from him, and thus would have lent force to Judge Aldisert's evidentiary concerns. As it turns out, however, time has been especially rude to Szehinskyj, not only in the survival of such incriminating documents, but in the vivid and detailed memory of this eighty-eight year-old survivor of the Nazi era, as she pictured him on a day in 1942, walking barefoot away from her and her waving daughter, his shoes draped over his shoulder.

There are, beyond the particulars of Szehinskyj's case, two more general responses to Judge Aldisert's concerns.

As Judge Aldisert notes, all crimes have statutes of limitations, with "the exception of murder cases." *Id.* at 342. Toward the conclusion of Dr. Sydnor's testimony, he referred to the concentration camps' evolution into a "closed culture of murder". The understated Dr. Sydnor did not lapse into hyperbole with this memorable phrase. The documentation admitted in evidence leaves no doubt that the camps were a thoroughly considered, meticulously organized enterprise of state-sponsored murder. The regulations that Heinrich Himmler himself inaugurated, and which his chief acolytes Theodor Eicke and Oswald Pohl embroidered, ordained a system that welcomed brutality and sanctioned mercy among the Totenkopf guards. Dr. Sydnor testified that no guard was ever so much as reprimanded for shooting an inmate when he should not have. By contrast, guards who withheld sanctions of inmates risked discipline from their superiors.

Those same regulations make it clear that no guard could long remain on the periphery of this closed culture. The practice of the Waffen SS was that Totenkopf guards every day were given new assignments, and none could plausibly contend that he spent the war merely watching from the edge. Thus, the heavy presumption from this incontrovertible historical record is that guards were, at a minimum, complicit in this closed culture of murder even if there may not be hard evidence of actual homicide at a particular guard's hands.

Actions like this one, therefore, are in their macabre way akin to murder prosecutions.

In addition to the language quoted above, Judge Aldisert, referring to the defendant in *Stelmokas*, thought that "[t]o continue the prosecution of octogenarians (and soon nonagenarians) is, to be sure, a political decision." *Id.* at 343. With defer-

---

48. Query how reliable any eyewitness could be identifying an unnamed guard fifty-five years beyond his early manhood.

ence, such prosecutions involve much more than "a political decision". Memory, after all, involves the often difficult enterprise of not forgetting. If the Government were to forget—and by its forgetting, effectively absolve—our fellow citizens' participation in the Third Reich's closed culture of murder, it would be making much worse than a bad "political decision". It would, by such forgetting, dishonor Sidney Glucksman, Rudolf Herz, Karl Schlesinger and Marion Wojciechowski, and the millions of other victims—some living, but most dead-of the greatest moral catastrophe of our civilization.

We thus cannot fault the Government when it remembers.

### ORDER AND JUDGMENT

AND NOW, this 24th day of July, 2000, for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that:

1. JUDGMENT IS ENTERED in favor of plaintiff the United States of America and against defendant Theodor Szehinskyj;

2. Defendant's United States citizenship is REVOKED;

3. The March 13, 1958 Order of the Court of Common Pleas of Delaware County admitting defendant to United States citizenship is VACATED;

4. Defendant's Certificate of Naturalization, No. 7836667, is CANCELLED, and defendant shall forthwith deliver the certificate, his United States passport, and any other indicia of United States citizenship to the Attorney General or her designee; and

5. Defendant is forever ENJOINED from claiming any rights, privileges, benefits, or advantages under any document evidencing United States citizenship.