

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-7-2002

# USA v. Szehinskyj

Precedential or Non-Precedential:

Docket 0-2467

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Szehinskyj" (2002). *2002 Decisions.* Paper 4.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/4

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 7, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-2467

UNITED STATES OF AMERICA

v.

THEODOR SZEHINSKYJ
a/k/a
FEDOR SZEHINSKI
a/k/a
THEODOR SZEHNISKIJ
a/k/a
THEODOR SZEHINSKY
a/k/a
THEODOR SZEHINSKI
a/k/a
THEODOR SZEHNKYJ

THEODOR SZEHINSKYJ,
       Appellant

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-cv-05348
District Judge: The Honorable Stewart Dalzell

Argued: September 7, 2001

Before: BECKER, Chief Judge, ALITO and
BARRY, Circuit Judges

(Opinion Filed: January 7, 2002)

Andre Michniak, Esq. (Argued)
Suite 1000
1420 Walnut Street
Philadelphia, PA 19102

Attorney for Appellant

William H. Kenety, V., Esq. (Argued)
United States Department of Justice
Office of Special Investigations
1001 G Street, N.W.
Washington, D.C. 20530
 AND
David W. Folts, Esq.
Robert J. Groner, Esq.
Suite 200
United States Department of Justice
Office of Special Investigations
1301 New York Avenue, N.W.
Washington, D.C. 20530

Attorneys for Appellee

OPINION OF THE COURT

BARRY, Circuit Judge:

Appellant Theodor Szehinskyj participated in what has accurately been described as the Third Reich's "closed culture of murder" which saw millions of victims die in the Holocaust, the "greatest moral catastrophe of our civilization." United States v. Szehinskyj , 104 F. Supp. 2d 480, 500-01 (E.D. Pa. 2000). The revocation of his United States citizenship is now before us, with Szehinskyj arguing that he was not what the evidence resoundingly showed him to be -- an armed concentration camp guard who "assisted in persecution . . . because of race, religion or national origin"; indeed, he argues that he never set foot in the camps in which it was shown that he served. He argues, as well, that even if the government proved that he was an armed guard, it did not prove that he made a material misrepresentation on his visa application and,

2

thus, his citizenship should not have been revoked. He is, in a word, wrong.

I.

In 1950, Theodor Szehinskyj, who was born in Poland but claims to be a Ukranian national, entered the United States, together with his wife and daughter, on an immigrant visa issued to him under the Displaced Persons Act of 1948 ("DPA"), Pub. L. No. 80-774, 62 Stat. 1009, as amended, June 16, 1950, Pub. L. No. 81-555, 64 Stat. 219. Eight years later, the Delaware County Court of Common Pleas granted his petition for naturalization, and he became a United States citizen on March 13, 1958.

In 1999, the government filed an action under section 340(a) of the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. S 1451(a), seeking revocation of Szehinskyj's citizenship on the ground that he assisted the Nazi government of Germany in persecuting individuals because of their race, religion and national origin when he served as an armed Nazi concentration camp guard during World War II. The District Court, after a five-day bench trial, concluded in extensive findings of fact and conclusions of law that Szehinskyj served as a Waffen SS Totenkopf (or "Death's Head") Division concentration camp guard who "assisted in persecution." He was not, therefore, entitled to the immigrant visa he received under the DPA and consequently was not lawfully admitted and eligible for naturalization under 8 U.S.C. S 1427(a)(1). 1 His citizenship was revoked. The District Court had jurisdiction under 28 U.S.C. SS 1331 & 1345. We have jurisdiction under 28 U.S.C. S 1291. We will affirm.

_____

1. 8 U.S.C. S 1427(a) provides:

> No person . . . shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years.

A. Material Misrepresentation Not Required

As suggested at the outset, Szehinskyj raises two issues on appeal: insufficiency of the evidence, albeit with various permutations and combinations, and the failure of the government to prove that he made a material misrepresentation on his visa application. We will deal with these issues in reverse order because the latter issue can be swiftly put to rest. Our review of what is a pure issue of law is plenary.

It is beyond dispute that "there must be `strict compliance' with all the congressionally imposed prerequisites to naturalization, and failure to comply with any of these terms renders the naturalization illegally procured and subject to revocation under section 1451(a) of the Immigration and Nationality Act." United States v. Breyer, 41 F.3d 884, 889 (3d Cir. 1994) (quoting Fedorenko v. United States, 449 U.S. 490, 506 (1981)). Because Szehinskyj entered this country under a visa issued to him pursuant to the DPA, the legality of his naturalization ultimately turns on his eligibility under that Act. Id.

Section 3(a) of the DPA made immigration visas available to "eligible displaced persons." 62 Stat. 1010. Any person who "assisted the enemy in persecuting civil populations" was excluded from the definition of an eligible displaced person. DPA S 2(b), 62 Stat. 1009 (incorporating the definition of displaced person in Annex I to the Constitution of the International Refugee Organization); see also Fedorenko, 449 U.S. at 495 & n.3. Section 13 of the Act, the section at issue here, states in pertinent part:

> No visas shall be issued under the provisions of this Act, as amended . . . to any person . . . who advocated or assisted in the persecution of any person because of race, religion or national origin.

DPA, as amended, 64 Stat. 219, 227. Thus, Szehinskyj was not eligible for his visa if, prior to obtaining the visa, he had advocated or assisted in persecution based on race, religion, or national origin. Assistance in persecution constitutes illegal procurement. Breyer, 41 F.3d at 889; United States v. Koreh, 59 F.3d 431, 438-42 (3d Cir. 1995).

4

But, says Szehinskyj, the government failed to prove that he obtained his visa because of a material misrepresentation and that this, too, is required. It is not. Whether or not Szehinskyj made, and the government proved, a material misrepresentation is irrelevant, for no such proof is required by the plain language of section 13 of the DPA.

We now make explicit that which has heretofore been implicit in our cases. The assistance in persecution ground for visa ineligibility is an independent ground that does not include a fraud element; once a determination of ineligibility is made on this ground, there is no need to look for and find a material misrepresentation. United States v. Tittjung, 235 F.3d 330, 341 (7th Cir. 2000); cf. Breyer, 41 F.3d at 889-91 (finding ineligibility without examining whether any misrepresentation occurred); Koreh , 59 F.3d at 438-42 (same).

As the Tittjung Court explained:

> To adopt Tittjung's reasoning, we would be forced to ignore the plain language of S 13(a) of the DPA as amended in 1950, something we cannot do. That Section states that `No visas shall be issued under the provision of this Act, as amended . . . to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin.' Section 13(a) does not contain a fraud element, but rather provides wholly independent grounds for denaturalization.

The Court concluded:

> Once [the] determination was made [that Tittjung's service as an armed concentration camp guard meant that he had assisted in persecution], the [district] court did not and was under no obligation to assess whether Tittjung had made misrepresentations in order to procure his visa.
>
> Requiring a finding of misrepresentation in order to determine illegal procurement would not only be inconsistent with the plain meaning of [section 13 of] the DPA, but would be in direct conflict with previous federal case law on the matter.

5

Tittjung, 235 F.3d at 341.

Szehinskyj, ignoring the plain language of the DPA and ignoring Tittjung, argues that a material misrepresentation is the jurisdictional fact under which, in Fedorenko, the Court predicated the invalidity of the visa before it. But, aside from other distinctions between that case and this, the Fedorenko Court was not considering an assistance in persecution charge. Rather, the Court was considering a charge against petitioner under section 340(a) of the INA, 66 Stat. 260, as amended, 8 U.S.C. S 1451(a), which requires revocation of citizenship that was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation," and section 10 of the DPA, 62 Stat. 1013, which provided that "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States."

Specifically, as relevant to the issue before the Court, Fedorenko was charged with willfully concealing on his visa application (and his application for citizenship) that he had served as an armed guard at the infamous Treblinka concentration camp and had committed crimes or atrocities against inmates because they were Jewish. The government's case rested on the claim that he had procured his naturalization illegally or by willfully misrepresenting material facts. Fedorenko, 449 U.S. at 497–98. The one count complaint before us did not allege, as a basis for revocation of citizenship, any such thing but, instead, relied on the independent ground of assistance in persecution. There is nothing in Fedorenko that even suggests that in such a case a material misrepresentation must still be proved.2

_____

2. One final note in this regard. While, of course, at no point did Szehinskyj disclose his wartime service to the Third Reich, courts have had little difficulty, even in a misrepresentation case, finding such a sin
of omission to be, nonetheless, a sin sufficient to warrant revocation of citizenship. As the Fedorenko Court put it, "we conclude that disclosure of the true facts about petitioner's service as an armed guard at Treblinka would, as a matter of law, have made him ineligible for a visa

6

Szehinskyj's material misrepresentation argument is without merit.

B. The Evidence was Sufficient

We now turn to the heart of this case -- whether the evidence supported the District Court's conclusion that Szehinskyj was an armed concentration camp guard who "assisted in the persecution of any person because of race, religion, or national origin." Szehinskyj, 104 F. Supp. 2d at 493. The District Court's conclusion is based on numerous findings of fact, which we review for clear error, and our review of its conclusions of law is plenary. Stelmokas, 100 F.3d at 313. In conducting our review, we must keep in mind that "the right to acquire American citizenship is a precious one," Fedorenko, 449 U.S. at 505, and, therefore, the government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." Id. (quoting Costello v. United States, 365 U.S. 265, 269 (1961)). The evidence for revocation must be "clear, unequivocal, and convincing" and not leave "the issue in doubt." Id. (quoting Schneiderman v. United States, 320 U.S. 118, 125 (1943)).

We note at the outset that Szehinskyj's response to the evidence against him has shifted. Before the District Court, his story was that he was never a guard at a concentration camp or a member of the SS. Rather, he claimed, he had worked on a farm in Austria as a "slave laborer" from February 1942 until November 1944 for Frau Hildegard

_____

under the DPA." Id. at 509. And, as we observed in United States v. Stelmokas, where we considered the case of a Schutzmannschaft officer who represented that he was a teacher:

> In our view, if you falsely represent that your employment is one thing when your actual employment is completely different, then you have concealed your true employment. In these circumstances, it is perfectly clear that Stelmokas himself demonstrates that he made a material misrepresentation when he sought displaced person status and a visa.

100 F.3d 302, 314 (3d Cir. 1996).

7

Lechner while her husband was on military duty in Russia and, after leaving her, did various unremarkable things. We note that after Szehinskyj had dug in his heels on this position -- according to the District Court, he had supplied Frau Lechner's name as an alibi -- somewhat miraculously the government found Frau Lechner, then eighty-eight years old, and her de bene esse deposition was thereafter taken. She recalled, clearly and in specific detail, that Szehinskyj left her farm in the late summer of 1942, and how and why he did so. The District Court listed numerous and specific reasons why it credited her "compelling" testimony in its entirety, finding her "completely credible" and "remarkably exact in her answers," with a "precise recollection of dates." Szehinskyj, 104 F. Supp. 2d at 495. It also listed numerous and specific reasons why it found Szehinskyj's testimony incredible, not the least of which were the powerful wartime documents which showed, beyond any question, where, in fact, he was during the relevant years and what, in fact, he was doing. But more about those later.

Before us his position somewhat subtly changed. Aside from arguing that Frau Lechner's testimony should not be believed and his should be, Szehinskyj argued not so much that he was not where the documents placed him, but that the documents were not enough to clearly and convincingly show that he assisted in persecution. There were no fact witnesses who pointed the finger at him nor was his signature on any documentation, he complained, and there were no photographs or fingerprints of him. At oral argument before us, there was yet another subtle change, to wit: even if he was there, and even if he was a concentration camp guard at the Gross-Rosen, Sachenhausen, and Warsaw concentration camps and a guard in a prisoner transport from Sachsenhausen to the concentration camp at Mauthausen, there was no evidence that he was an armed guard and, thus, the government did not prove that he "assisted in persecution." Indeed, for purposes of argument, Szehinskyj was effectively willing to concede everything but the "armed" status.

After carefully reviewing the record, we find no reason to believe that the District Court clearly erred in determining

8

that Szehinskyj served as an SS Totenkopf guard. The remarkable consistency of the information contained in the six Nazi wartime documents retrieved from Russian, German, and Ukrainian archives -- concentration camp Change of Strength Reports, Troop Muster Rolls, and a Transfer Order -- incontrovertibly supports the District Court's finding. Not only did each of those documents identify Szehinskyj by name, but each also noted his date of birth, place of birth, religion, and mother's first and maiden names, making it unlikely in the extreme that the documents referred to a different Theodor Szehinskyj. As the District Court put it:

> Szehinskyj has been convicted by incontrovertible documents, all but one of which did not see the light of Western eyes until after the collapse of the Soviet Union on December 31, 1991. These wholly consistent ancient documents, having reposed for over fifty years in Moscow, Kiev, and Berlin, leave no doubt that this Theodor Szehinskyj was a member of the Totenkopf battalion at the Gross Rosen, Sachsenhausen and Warsaw concentration camps, and almost certainly at Mauthausen and Flossenburg as well. From January of 1943 through at least April of 1945, Szehinskyj was thus part of the Totenkopf guard in at least three venues of the Final Solution.

Szehinskyj, 104 F. Supp. 2d at 500. The testimony of Frau Lechner provides further corroboration of the story outlined in the documents, as does the consistency of those documents with yet other documents. Based on this evidence, the District Court found "without hesitation" that the Theodor Szehinskyj before the Court and the Theodor Szehinskyj mentioned in the Nazi documents were identical. Id. at 499. We reach the same conclusion.

Szehinskyj argues, however, that even if he did serve as a concentration camp guard, the government presented no proof that he was armed and no proof of any other specific conduct that constituted assistance in persecution. We disagree. Szehinskyj correctly notes that similar cases in recent years have involved somewhat more individualized evidence of assistance in persecution than is present here. See, e.g., Breyer, 41 F.3d at 890 ("The record is

uncontroverted that [the defendant] was a trained, paid, uniformed armed Nazi guard who patrolled the perimeters of two such camps with orders to shoot those who tried to escape."). Lacking specific accounts of Szehinskyj's day-to-day activities in the SS Totenkopf, -- accounts increasingly difficult to obtain given the passage of so many years -- the government chiefly relied on the testimony of Dr. Charles Sydnor, a respected Holocaust scholar, to show beyond peradventure that Szehinskyj was armed based on the fact that he was a concentration camp guard. Beyond Dr. Sydnor's testimony, the record is replete with accounts of the inhuman orders carried out by members of the Death's Head Battalion in which Szehinskyj served, including the accounts of four survivors of the camps involved in this case.

The District Court, in a comprehensive opinion, synopsized this evidence, graphically describing the "horrifyingly clear picture of life in the concentration camps" in which Szehinskyj was shown to have served and the survivors' "vivid living testimony of what a nightmare a prisoner's daily life was" in those camps -- camps which were a "thoroughly considered, meticulously organized enterprise of state-sponsored murder." Szehinskyj, 104 F. Supp. 2d at 487 & 500. We could not improve on that description and will not attempt to do so. Instead, we will quote the relevant portions virtually in full, deleting the citations to the record and the notes in margin, some of which make the case that Szehinskyj had to have been armed even more powerfully.

> The Nazis, under the direction of Hitler, SS Head Heinrich Himmler, and Himmler's protege, Theodor Eicke, created three basic types of concentration camps under the exclusive control of the SS: confinement and slave labor camps, extermination camps, and, as the war progressed, combined slave labor and death camps. Conditions in the camps were inhuman: disease was rampant, sanitation, medical care, and heat were nonexistent, and inmates received little food, less than 1,000 calories per day. At labor camps, inmates were made to work eleven- or twelve- hour days in brutal conditions, even at night in the bitter

10

winter. Prisoners died every day from malnutrition, exhaustion, disease, beatings, suicide, or murder. Many were subject to cruel and deadly medical experiments. One such experiment involved inflicting a flesh wound with a poison-tipped bullet and documenting how long it took the prisoner to die from the poison.

*   *   *

 As is made clear from the survivor accounts . . . the Waffen SS Death's Head Battalion guards were vital to maintaining the terror of the camps. Dr. Sydnor testified that the camps simply could not have functioned without them. The guards, who were uniformed, armed, paid, and given leave, were instructed to shoot any prisoner who attempted to escape. They subjected inmates to both official and unofficial physical punishments as well as verbal abuse and persecution.

*   *   *

 All of the guards were armed at all times. An "Instruction on Tasks and Duties of the Guard" circular quotes the General Guard Directive, to wit:"It is forbidden to the guard, unless explicitly determined otherwise, to lay his weapon down." Also, an illustrated instruction book for guards who did not speak German depicts every guard, without exception, holding a gun.

 Dr. Sydnor emphasized that Totenkopf guards were not assigned to the same jobs every day at the camps. They had to be able to perform each type of duty-night patrol, escorting inmates to and from work details, guarding them at work, service in the watchtower, patrolling the perimeter of the camp, etc. They also had to be ready at any moment to search for escapees.

 The Totenkopf Battalion guards also were used in prisoner transports from one camp to another. On these hellish transports, during which prisoners routinely died, the duty of the guards was the same as at the camps: to make sure no prisoners escaped. Guards surrounded the train cars with guns drawn at

11

every stop. ("Wrong/Right" illustration book depicting guards with guns pointed at prisoners as they board and exit a boxcar). Conditions for prisoners were abysmal, with no heat, food, or sanitation.

While the Nazi documents and Dr. Sydnor's testimony paint a horrifyingly clear picture of life in the concentration camps, the stories contained in the affidavits of four camp survivors offer vivid living testimony of what a nightmare a prisoner's daily life was in the camps involved in this case.

\* \* \*

Dr. Sydnor specifically noted that these inhuman conditions, of which we have provided only a flavor, existed at the camps at Gross Rosen, Sachsenhausen, and Warsaw from 1943 through 1945, during Szehinskyj's alleged period of Nazi service. Conditions at Mauthausen and Flossenburg were no better.

Szehinskyj, 104 F. Supp. 2d at 485-488.

It is clear that personal participation in atrocities is not required for one to have assisted in persecution-- being an armed concentration camp guard is sufficient. Fedorenko, 449 U.S. at 512; Breyer, 41 F.3d at 890; United States v. Kairys, 782 F.2d 1374, 1377 n.3 (7th Cir. 1986). Indeed, we have found assistance in persecution by an editor who was "armed" only with a newspaper which spewed anti-Semitic bile. In so doing, we recalled the maxim that "the pen is at least as mighty, if not mightier, than the sword." Koreh, 597 F.3d at 439.

The District Court found that, given the "horrific" camp regulations and practices, it was "unlikely" that Szehinskyj never physically harmed an inmate. Szehinskyj , 104 F. Supp. 2d at 499. This is the only reasonable conclusion to be drawn from the record. Even if he did not, the Court continued, the concentration camp guards all carried guns and were under strict orders to use them, and Szehinskyj was an armed Totenkopf concentration camp guard."By definition" -- and, we add, by "clear, unequivocal, and convincing" evidence -- "the Totenkopf assisted in [the] persecution of Jews and others considered racially inferior

12

or `defective' " -- this was Szehinskyj's "very role at the camp[s]." Id. Szehinskyj was, thus, ineligible for a visa under the DPA and could not have been lawfully naturalized in 1958. The evidence clearly supported that conclusion.

II.

The District Court's order revoking Szehinskyj's citizenship and ordering him to surrender his certificate of naturalization will be affirmed.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

13