**UNITED STATES of America, Plaintiff,**

v.

**Fedir KWOCZAK, Defendant.**

**Civil Action No. 97–5632.**

United States District Court, E.D. Pennsylvania.

June 27, 2002.

**43.** I will entertain a request for immediate review of this order.

Scott A. Coffina, Assistant U.S. Attorney, Philadelphia, PA, Eli M. Rosenbaum, Edward A. Stutman, U.S. Dept. of Justice, Office of Special Investigations, Criminal Division, Jonathan C. Drimmer, U.S. Department of Justice Office of Special Investigations, Washington, DC, John Rogers Carrol, Carroll & Carroll, Philadelphia, PA, for Defendant.

## OPINION

POLLAK, District Judge.

The government brought this civil action pursuant to § 340(a) of the Immigration and Nationality Act of 1952 ("INA"), codified at 8 U.S.C. § 1451(a), to revoke the citizenship of defendant Fedir Kwoczak. The government charges that Mr. Kwoczak procured American citizenship illegally by obtaining an immigration visa to which he was not entitled; according to the gov-

ernment, the defendant's lack of entitlement to enter the United States stemmed from his alleged service (1) as a guard at Nazi labor and extermination camps in German-occupied Poland from 1943 to mid–1944, and (2) as a member of the Battalion Streibel, a unit to which guards at the labor and extermination camps were transferred in mid–1944 when the advancing Soviet army moved into eastern Poland. Relying on three separate subsections of the Displaced Persons Act of 1948 ("DPA"), Pub.L. No. 80–774, ch. 647, 62 Stat. 1009, the government urges three independent grounds for revoking Mr. Kwoczak's citizenship. The court conducted a bench trial on those three claims.

This opinion constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1] In the first section of this opinion, the government's burden of proof in a denaturalization proceeding is defined. In Section II, I summarize the government's case—first, the government's exposition of the relevant historical background, and second, the evidence mustered against Mr. Kwoczak himself. In Section III, a corresponding assessment is made of the defendant's case. In Section IV, I set forth findings of fact. Finally, in Section V, I set forth conclusions of law with respect to the three claims made by the government, in the following order: first, that Mr. Kwoczak made willful, material misrepresentations on his visa application in violation of § 10 of the DPA; second, that Mr. Kwoczak assisted in the persecution of civilians in violation of § 2(b) of the DPA; and third, that Mr. Kwoczak participated in a movement hostile to the United States and its form of government in violation of § 13 of the DPA. Judgment will be entered in favor of the United States on the first and second claims.

## I. The Government's Burden of Proof

■ The government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." *Fedorenko v. United States,* 449 U.S. 490, 505, 101 S.Ct. 737, 66 L.Ed.2d 686 (1981) (quoting *Costello v. United States,* 365 U.S. 265, 269, 81 S.Ct. 534, 5 L.Ed.2d 551 (1961)); *see also United States v. Szehinskyj,* 277 F.3d 331, 336 (3d Cir.2002). To prevail, the government must prove its case by evidence that is " 'clear, unequivocal, and convincing' and [does] not leave 'the issue in doubt.' " *Fedorenko,* 449 U.S. at 505, 101 S.Ct. 737 (quoting *Schneiderman v. United States,* 320 U.S. 118, 125, 63 S.Ct. 1333, 87 L.Ed. 1796 (1943)); *see also Kungys v. United States,* 485 U.S. 759, 772, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988). The magnitude of the government's burden of proof in a proceeding such as this reflects our nation's consensus that "the right to acquire American citizenship is a precious one and that once citizenship has been acquired, its loss can have severe and unsettling consequences." *Fedorenko,* 449 U.S. at 505, 101 S.Ct. 737; *see also Szehinskyj,* 277 F.3d at 336.

## II. The Government's Case

### A. Historical Background

The significance of the government's allegations against Mr. Kwoczak derives in large part from their historical context. To elucidate this context, the government relied on the testimony of Charles Wright Sydnor, Jr., a historian whose field of special scholarly focus is the Nazi era. Dr. Sydnor was accepted by this court as an

---

1. "In all actions tried upon the facts without a jury ... the court shall find the facts specifically and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58...." Fed.R.Civ.P. 52(a).

expert witness on the history of Nazi governance of Poland. *See* Transcript of Bench Trial ("Tr.") 1/10/00, at 65–70.[2] Dr. Sydnor provided general background testimony and also detailed explication of numerous documents submitted as evidence by the government. I found Dr. Sydnor's testimony, taken as a whole, to be compelling.[3] The following historical summary, detailing certain events in Eastern Europe during the 1930s and 1940s, consists of facts with respect to which the government's heavy burden of proof has been carried.

### The Schutzstaffel ("SS"):

Throughout the latter half of the 1930s, Hitler took steps to consolidate police power in Germany under the auspices of his own elite guard, the *Schutzstaffel*, better known by its acronym "SS." By the onset of World War II, in 1939, the SS, under the leadership of Heinrich Himmler, was an organization that operated beyond the reach of all external authorities. The SS controlled networks of concentration camps for the incarceration of persons deemed hostile to the Nazi regime, and extermination camps for the killing of Gypsies, Jews and other ethnic minorities, and also persons with perceived physical, mental and emotional disabilities. As the German war effort progressed, Himmler took steps to harness the labor of concentration camp prisoners for the manufacture of such things as weaponry, automobiles, and clothing. By oral order from Hitler to Himmler in the summer of 1941, the SS was charged with the task of systematically liquidating Jewish populations in areas under German control.

### Operation Reinhard:

When the war began, Himmler was given authority to extend the police power of the SS beyond Germany. Germany invaded Poland on September 1, 1939, and annexed certain former Polish regions on October 26, 1939. Those areas of Poland occupied by the German army but not annexed into Germany proper were placed under a German civil administration called the *Generalgouvernement*, or Government General, the head of which was Governor General Hans Frank. The Government General was initially comprised of the Warsaw, Lublin, Radow, and Cracow districts; after the German invasion of the Soviet Union in June of 1941, a fifth district, Galicia, was added. Also there was established a Special Administrative District of Bialystok adjacent to the Government General. In the fall of 1941, the SS commenced a campaign to exterminate the Jewish communities residing in Poland. The campaign was denominated *Einsatz Reinhard* or *Aktion Reinhard* ("Operation Reinhard").

The initial stage of Operation Reinhard's extermination program was the process euphemistically called "evacuation." Evacuation was put into practice at several different times and locations in Poland in the ensuing years. The first phase of evacuation involved the concentration of

---

**2.** Dr. Sydnor, former president of Emory and Henry College, is the author of *Soldiers of Destruction: The SS Death's Head Division 1933–1945* (Princeton University Press 1977).

Dr. Sydnor has provided expert testimony for the United States in other proceedings similar to this one. *See, e.g., United States v. Szehinskyj*, 104 F.Supp.2d 480, 483 n. 3 (E.D.Pa.2000); *United States v. Hajda*, 963 F.Supp. 1452 (N.D.Ill.1997); *United States v.*

*Schiffer*, 836 F.Supp. 1164, 1175 (E.D.Pa. 1993).

**3.** At a few points during the course of Dr. Sydnor's testimony, I sustained certain defense objections to questions asking Dr. Sydnor to opine beyond his area of expertise or to draw overly spacious inferences from government exhibits. *See, e.g.,* Tr. 1/12/00 at 114–15. But the great bulk of Dr. Sydnor's admissible testimony I found highly persuasive.

the victims in enclosed ghettos within various cities. Approximately 350,000 Jews were confined to a ghetto in Warsaw beginning in November of 1940. Another 25,000–30,000 Jews were confined to a ghetto in the city of Bialystok beginning in August of 1941.

The next phase involved the transfer of the Jews from the ghettos to extermination camps, where they were killed by means of carbon monoxide gassing or shooting. The SS established extermination camps at Treblinka in the Warsaw District, and Belzec and Sobibor in the Lublin District, and also a concentration camp at Majdanek, just outside the city of Lublin. The Warsaw ghetto was liquidated in April and May of 1943: its buildings were burned, and those residents who were not killed during the armed revolt which commenced on April 19—the revolt known as the Warsaw Ghetto Uprising[4]— were sent to labor and extermination camps at Treblinka, Majdanek, Trawniki and Poniatowa. Residents of the Bialystok ghetto were likewise rounded up between August 16 and September 8, 1943, and were sent to camps at Treblinka, Sobibor, and Majdanek.

Operation Reinhard also provided for the exploitation and brutalization of thousands of Jews at forced labor camps. The SS established forced labor camps at Trawniki and Poniatowa in the Lublin District. On November 3 and 4, 1943, in part of a massacre known by the code name "Operation Harvest Festival," SS units murdered approximately 42,000 Jews who were being held at the Poniatowa and Trawniki labor camps.

Overall, Operation Reinhard resulted in the deaths of approximately 1,700,000 Polish Jews. The SS routinely appropriated the personal property of its victims.

### Trawniki Training Camp:

In support of Operation Reinhard, the SS established a training camp for guards at Trawniki in the Lublin District. The Trawniki training camp was supervised by an SS major named Karl Streibel, but the guards under his command were not members of the SS. From the fall of 1941 through the late summer of 1943, recruits were trained at Trawniki to guard persons in transit between, and confined at, ghettos, concentration and labor camps, and extermination complexes. During February of 1943, a recruitment drive for so-called "Trawniki men" was undertaken among the Polish population in the Galicia District. Recruits were promised that, by serving in the guard units, they would not be sent into combat at the front, and would receive regular pay, meals, and a uniform. In some instances, the incentives were reinforced by coercive measures. Tr. 1/13/00 at 47–49.

Dr. Sydnor gave extensive testimony regarding the mode of operations at Trawniki training camp, beginning with the procedure new recruits into the *Wachmannschaften* ("Guard Forces") were ex-

---

4. The formal Nazi documentation of the Warsaw Ghetto Uprising was the so-called Stroop Report, named after SS General Jürgen Stroop, the commander of the German evacuation operations. In its Exhibit 89, the government introduced various portions of the Stroop Report into evidence. Over the defendant's objections, I admitted the majority of the Report, specifically: all of the English translation with the exception of pages 10 and 11 and the first five lines of 12, and all of the German language exhibit with the exception of pages 089751 and 089752 and the first 12 lines of page 089753. *See* Transcript of Hearing 7/19/00 at 10; *see also* n. 5 *infra*.

The government also relied on the eyewitness testimony of Warsaw Ghetto resident Samuel Hilton, a survivor of the Uprising, to establish the nature and extent of that tragedy. Mr. Hilton was thirteen years old at the time. Tr. 1/18/00 at 92 ff.

pected to follow. Tr. 1/12/00 at 107 ff. New recruits provided a clerk with information regarding such personal details as their name, date of birth, home town, and profession or trade, and had their picture taken for their personnel cards. The companies of recruits were broken down into platoons and squads for training purposes. Trawniki men were paid in cash on a regular basis, and could apply for and receive leave time. Guards achieved promotion within their Trawniki units, not as a matter of course, but on merit. Tr. 1/13/00 at 40. Trawniki trainees were taught how to march in formation and underwent physical conditioning. They were issued a standard uniform and rifle, and were taught how to clean, operate, maintain, and shoot a rifle. They were also instructed as to the process of guarding prisoners, and were used to escort the Jewish prisoners on work details both within the Trawniki labor camp and without. In addition, Trawniki men were indoctrinated into Nazi ideology. Thus trained, the Trawniki men were essential to the implementation of Operation Reinhard.

Trawniki men found to be unsuitable for service were discharged. *Id.* at 25. Serious injuries—e.g., a shooting wound to the hand, or the amputation of two fingers following a rifle injury—tended to result in outright dismissal from service. *Id.* at 40–46. But Trawniki men suffering from moderate illness or disability would, ordinarily, be temporarily assigned to an *arbeitskompanie,* or work company, to perform light duties until they had recovered enough to resume their normal duties. According to Dr. Sydnor, an *arbeitskompanie* would have resembled what is known as a convalescent company in the American military. Trawniki men who

suffered from vision problems—one who had lost an eye to a shrapnel wound, two others with nearsightedness requiring the wearing of corrective lenses—were nonetheless expected to carry out their usual duties. *Id.* at 36–40.

### *The Battalion Streibel:*

Following the Soviet offensive of mid–1944, the Trawniki training camp and the other locations in eastern Poland where the Trawniki men served were dissolved. The Trawniki men were thereupon reorganized as the "Battalion Streibel." The Battalion Streibel was disbanded at some point after February 15, 1945, after a southward retreat into what is now the Czech Republic.

### B. Mr. Kwoczak's Wartime Activities and Emigration to the United States

In order to link Mr. Kwoczak to the Trawniki guard forces and to the Battalion Streibel, the government presented considerable documentary evidence.[5]

### *Transfer Rosters and Personnel Files:*

The government puts heavy emphasis on seven transfer rosters detailing assignments of individuals to various training facilities and strategic locations in Eastern Europe during the relevant time period.

Four of the rosters are concerned with assignments of Trawniki men. Exhibit 4A is a transfer roster reflecting the assignment of approximately 350 men from the Trawniki training camp to the Warsaw detachment on April 17, 1943, two days before the start of the liquidation of the Warsaw ghetto. At the 226th line of the roster appears the name of *Wachmann* (which translates as "guard private") "Fedor Kloczak," who is designated as a mem-

<hr>

5. At trial, the defendant raised objections to the admissibility of a number of the government's exhibits. In an opinion issued from the bench, I addressed those objections, overruling most of them. *See* Transcript of Hearing 7/19/00 at 10, 11, 14, 15, 16, and 18.

ber of the "5th Company," and identified with the number 3222. Exhibit 5 is a transfer roster reflecting the assignment of approximately 100 men from Trawniki to Bialystok on August 14, 1943, two days before the start of the liquidation of the Bialystok ghetto. The name of *Wachmann* "Fjodor Klotschak" appears on the 44th line of the roster, opposite "Identification No. 3222." Exhibit 6 is a roster dated October 3, 1943, memorializing several assignments of guards: one of the entries reflects the assignment of *Wachmann* "Fjodor Klotschak Identification No. 3222" to "the transport detachment: to Warsaw." Exhibit 7A is an undated roster of the Poniatowa Guard Detachment, including approximately 110 men, among them *Wachmann* "Fjodor Klotschak Identification Number 3222," listed on line 42—the typed "w" in the surname having been struck through by hand, and an "l" having been written in its place.

Another three rosters are concerned with assignments of members of the Battalion Streibel. Exhibit 8 is an undated roster of the 7th Company of the Battalion Streibel, which Dr. Sydnor testified was carried and used by the company until at least January 25, 1945, the date on which, retreating before the advancing Soviet army, it moved out of the Government General. The top of the roster bears the hand-written words "in Skotniki," of which the latter word has been struck out and replaced with "Ottendorf–Okrilla." Among the 87 names on the list is that of *Oberwachmann* (which translates as "guard private first class" and thus indicates a rank superior to that of *Wachmann*) "Fedor Kwoczak Identification No. 3222" at line 45. Exhibit 9 is a company list of the 7th Company of the Battalion Streibel, dated February 12, 1945, on which the name "Fedor Kwoczak" appears on line 17. The government contends that the dates recorded adjacent to each name

on this list represent birth dates; Dr. Sydnor testified that the date next to the name of Company Captain Heinrich Otto is his birth date as revealed by post-war documents. The date beside the name "Fedor Kwoczak" is March 17, 1921. Exhibit 10 is a "Company List of the 7th Company," dated April 6, 1945, and bearing the heading "in Ottendorf–Okrilla." At line 48 of this document is found the name *"Oberwachmann* Fedir Kwoczak" adjacent to the number "3222."

The government also introduced numerous personnel files for Trawniki men. Exhibits 23–76 and 268–269 are personnel files for Trawniki men that feature, *inter alia*, the identification numbers, names, birthplaces, and dates of arrival of Trawniki recruits. Dr. Sydnor testified that the person to which identification number 3222 was assigned—*i.e.*, the defendant or someone of strikingly similar name—would have arrived at Trawniki on February 13, 1943. Tr. 1/12/00 at 84–98; Tr. 1/13/00 at 54. The recruits who arrived at Trawniki during February were organized into the 5th Company. Tr. 1/12/00 at 112. On reviewing the 5th Company transfer documents, Dr. Sydnor concluded that the 5th company was moved to Warsaw to assist in the liquidation of the Warsaw ghetto, to Bialystok to assist in the liquidation of the Bialystok ghetto, and to Poniatowa to guard inmates.

### Documents Relating to Defendant's Status as a "Displaced Person" and His Application for a Visa:

Exhibit 2 is a Displaced Persons Registration Card issued by the International Tracing Service (ITS) on January 26, 1946 for the individual "Fedir Kloczak." According to Dr. Sydnor, the ITS, a branch of the International Red Cross, was created to assist refugees and displaced persons in relocating, finding missing relatives, and

other personal matters after the war. The card records the birth date of "Fedir Kloczak" as March 17, 1921 and his mother's maiden name as Xenia Stefinka. The card contains both the name "Kloczak" and, written as an annotation in heavier print, the name "Kwoczak."

Exhibit 1 is an application for immigration visa and alien registration. The applicant's name is listed as "Fedir Kwoczak," his birth date as March 17, 1921, and his mother's maiden name as Xenia Stefinka. The applicant's place of residence between 1944 and 1945 is denoted Ottendorf; in 1945, Dresden; and between 1945 and the date of the application, Munich. On the reverse side of the document appears the visa itself, issued on September 9, 1949 in Munich.

## III. The Defendant's Case

In the course of the trial, Mr. Kwoczak objected to numerous documents submitted in evidence by the government. The bulk of those objections were overruled. *See* n. 5 *supra.* In his post-trial submissions, Mr. Kwoczak renews many of these objections; they are again overruled. In addition, Mr. Kwoczak disputes the inferences to be drawn from the evidence as a whole. Instead, he offers a version of his wartime activities that differs markedly from the government's version.

Mr. Kwoczak argues that he arrived at Trawniki in February of 1943, but was sent home to Tysmienica until he received a second notice to report at the training camp. He then returned to Trawniki in June or July of that year. He admits to having been paid a regular wage as a Trawniki man, and to having sought and received leave time. However, Mr. Kwoczak asserts that he was given a medical examination after arriving in the camp that summer, which revealed that he suffered from a vision problem in his right

eye. Because of this diagnosis, Mr. Kwoczak submits that he was placed not into the 5th Company, which was a unit for guards in training, but into an *arbeitskompanie.* According to Mr. Kwoczak, he was subsequently assigned to training despite his vision deficiency, and that in the course of training he injured his hand on a bayonet and had to wear a cast. Mr. Kwoczak contends that he was transferred from Trawniki to Poniatowa shortly after the injury, his entire tenure at Trawniki amounting to no more than a week and a half. Mr. Kwoczak further asserts that upon being sent to Poniatowa, he was assigned to another *arbeitskompanie* until November 1944, when he was sent to Ottendorf.

The government challenges the credibility of Mr. Kwoczak's assertions regarding the vision impairment and the injury to his hand; the government points to the fact that the defendant has been licensed to drive by the Commonwealth of Pennsylvania since 1950 without glasses. In addition, the government refutes Mr. Kwoczak's contention that after arriving at Trawniki in February of 1943 he was sent home to Tysmienica in the Galicia District until ordered to return in June or July. The government points to testimony of Dr. Sydnor tending to establish that, by June or July of 1943, the Germans were no longer recruiting for Trawniki trainees in the Galicia District. Tr 1/13/00 at 8.

## IV. Findings of Fact

The government has presented a very strong case. There are certain limited aspects of the government's presentation of which I am not persuaded by the rigorous standard of proof that governs denaturalization proceedings; those are identified in the discussion which follows. On the whole, however, I find the testimony of the government witnesses, starting with Dr.

Sydnor, to be clear, unequivocal and convincing. *See* n. 7 *infra.* So too is the documentary evidence. The documents identify Mr. Kwoczak by name; Dr. Sydnor testified that the various spellings of the surname "Kwoczak," "Kloczak," "Klotschak," and "Kvochak," and the various spellings of the given name "Fedir," "Fedor," and "Fjodor," merely reflect the difficulty of German clerks in spelling foreign names. Tr. 1/12/00 (Docket # 34) at 46–47. He gave his opinion that the documents listed above all refer to the same person despite the inconsistency in spelling. *Id.* at 47–52. Dr. Sydnor's testimony, taken together with the other information in the admitted documents linking them to the defendant—such as his birth date, his identification number at Trawniki, and the maiden name of his mother—suffices to establish, beyond any real doubt, that these several documents all refer to the defendant.

## A. Mr. Kwoczak's Training at Trawniki

Mr. Kwoczak was among those persons recruited for service in the guard forces from the Galicia District in February of 1943, traveling from his home town of Tysmienica to Trawniki on or about February 13, 1943. Upon his arrival at Trawniki, Mr. Kwoczak was assigned identification number 3222 and given a uniform. He was inducted into the *Wachmannschaften,* and was thus invested with the rank of *Wachmann* in the 5th Company at Trawniki. He received pay and was granted leave during his affiliation with the guard forces. Mr. Kwoczak underwent the standard guard training at Trawniki, and never sought discharge from guard service after his admission to the Trawniki camp.

The duration of Mr. Kwoczak's training at Trawniki and the precise nature of his activities as a Trawniki man are matters of considerable dispute in this litigation. The government has established to my satisfaction that Mr. Kwoczak was at Trawniki for approximately eight weeks. On the other hand, I find that the government has not succeeded in meeting its considerable burden of proof in challenging Mr. Kwoczak's claimed assignment to an *arbeitskompanie* at Trawniki and Poniatowa.

## B. Mr. Kwoczak's service with the 5th Company at Warsaw, Poniatowa and Bialystok

### *Warsaw:*

The government has established, by clear, unequivocal and convincing evidence, the following details of Mr. Kwoczak's activities in Warsaw. Mr. Kwoczak was deployed with the 5th Company of Trawniki guards to Warsaw on April 17, 1943, contemporaneous with the commencement of the liquidation of the ghetto in that city. A battalion of Trawniki men, including the 5th Company, entered the ghetto on April 19, the date on which the Warsaw Ghetto Uprising commenced. The Trawniki unit was used not in the assault on the insurgents, but in guarding the periphery of the ghetto to make certain that no one escaped, and in overseeing the transport of the ghetto residents to the Treblinka extermination camp.

### *Poniatowa:*

As to the precise nature of Mr. Kwoczak's activities at Poniatowa, the evidence is inconclusive. In June of 1943, three companies of Trawniki men, including the 5th, were assigned to serve as armed guards at the labor camp at Poniatowa. The Trawniki men manned watchtowers, patrolled the borders of the camp, guarded work sites, and did sentry duty at camp entrances. However, as noted, Mr. Kwoczak contends that because of his vision impairment, he was assigned to an *arbeitskompanie* at Poniatowa; the labor

company, according to the defendant, was assigned to light clerical duties such as answering the telephone, doing laundry, working in the kitchen, or tending the stable. On the basis of the record before me, I am unable to conclude that the government has sufficiently overcome the defendant's version of his activities at Poniatowa, when assigned there in June of 1943.

### Bialystok:

I find that the government has established, by clear, unequivocal and convincing evidence, the following details of Mr. Kwoczak's activities at Bialystok. Mr. Kwoczak was among approximately 100 Trawniki men posted to Bialystok on August 14, 1943, two days before the liquidation of the Bialystok ghetto was to commence. Trawniki guards oversaw the removal of ghetto residents from their homes, and oversaw their transport by train to the concentration camps of Treblinka, Auschwitz, and Majdanek. Mr. Kwoczak participated in these activities.

### Poniatowa again:

It is clear that Mr. Kwoczak returned to Poniatowa at some point before October 3, 1943, and remained until some time between March 31, 1944 and the Soviet liberation of the camp in July of 1944. As noted in the preceding section, "Operation Harvest Festival," the massacre of prisoners at Poniatowa and Trawniki labor camps, took place in November of 1943. The government has not presented evidence that Mr. Kwoczak was an active participant in the massacre.

At some point between March and December of 1944, Mr. Kwoczak was promoted to the rank of *Oberwachmann.*

### C. Mr. Kwoczak's Service with the Battalion Streibel

Clear, unequivocal and convincing evidence establishes that from late summer of 1944 through at least April 6, 1945, Mr. Kwoczak was a member of the 7th Company of the Battalion Streibel. From August, 1944 through January, 1945, members of the Battalion Streibel guarded thousands of civilian forced laborers at fortification and construction sites along the Nida and Vistula Rivers. There is no reason to doubt that Mr. Kwoczak participated in these functions. The battalion was relocated to Ottendorf, ten miles northeast of Dresden, in mid-February of 1945, in order to clear rubble caused by the Allied fire-bombing raid of February 13 and 14. Mr. Kwoczak was deployed to Ottendorf along with the battalion.

### D. Mr. Kwoczak's immigration and naturalization proceedings

The nature of Mr. Kwoczak's immigration and naturalization proceedings is not disputed, nor is the content of the representations he made during the course of those proceedings.[6]

In August of 1949, Mr. Kwoczak applied to the United States Displaced Persons Commission ("DPC") for a determination

---

**6.** The government relies on the documentary evidence detailed above, and on the testimony of Samuel Frey, Leo B. Curry, and John M. Thompson, Jr. to establish the facts recounted herein regarding Mr. Kwoczak's visa application procedure. Mr. Frey was a member of the Army Counterintelligence Corps (CIC), assigned to the visa section of the CIC, between April or May of 1949 and April or May of 1950. Tr. 1/18/00 at 122 ff. Mr. Curry was an employee of the Displaced Persons Commission from November of 1948 through February of 1952. Tr. 1/19/00 at 2 ff. Mr. Thompson was a vice consul with the United States Department of State, assigned to Munich in March of 1949. *Id.* at 50 ff. Mr. Thompson testified that he interviewed Mr. Kwoczak in connection with his visa application, and testified as to the substance of that interview.

that he was eligible to emigrate to the United States under the DPA. In connection with this application, he was interviewed by the United States Army's Counter Intelligence Corps ("CIC"). During his interview, Mr. Kwoczak made no mention of his training at Trawniki and subsequent service with the Trawniki guard forces and the Battalion Streibel, nor of his presence at Trawniki, Poniatowa, Warsaw and Bialystok. In response to queries regarding his activities and geographic location during the preceding years, Mr. Kwoczak stated that he worked on his father's farm in Tysmienica until he went to Ottendorf as a forced laborer in April of 1944. On August 22, 1949, the DPC issued a report reflecting the information conveyed to the CIC by Mr. Kwoczak, and concluding that Mr. Kwoczak was a displaced person for purposes of the DPA.

On September 8, 1949, Mr. Kwoczak filed an Application for Immigrant Visa and Alien Registration with the American Consulate in Munich, Germany, seeking a non-quota immigrant visa to the United States under the DPA. On this visa application, Mr. Kwoczak listed "Tysmeniczi" (sic) as his place of residence for the years 1935–1944, and Ottendorf as his place of residence from 1944–1945. After completing his visa application, Mr. Kwoczak was interviewed under oath the same day—September 8, 1949—by American Vice Consul John W. Thompson, Jr. During the interview Mr. Kwoczak confirmed the information presented in his visa application. Mr. Kwoczak's application was accepted and, that day, he was issued an immigrant visa under the DPA.

Mr. Kwoczak entered the United States at the Port of New York on October 1, 1949. On March 25, 1957, he filed an Application to File Petition for Naturalization with the United States Immigration and Naturalization Service ("INS"), but

was advised to defer filing for naturalization until his English skills were more fully developed. On March 7, 1966, Mr. Kwoczak filed a second application with the INS. On May 25, 1966, Mr. Kwoczak signed and filed with the INS a Petition for Naturalization, and orally swore to the truth of the information provided therein. On August 3, 1966, a judge of this court—the United States District Court for the Eastern District of Pennsylvania—granted Mr. Kwoczak's petition for naturalization, and directed the issuance to him of Certificate of Naturalization No. 8962304.

## V. Conclusions of Law

The INA imposes upon the government the duty to bring a civil action against a naturalized citizen "for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a). Thus, denaturalization is mandated for a person whose citizenship was obtained by unlawful means. See Fedorenko, 449 U.S. at 517, 101 S.Ct. 737 ("[O]nce a district court determines that the Government has met its burden of proving that a naturalized citizen obtained his citizenship illegally ... it has no discretion to excuse the conduct."); United States v. Koreh, 59 F.3d 431, 438 (3d Cir.1995). A condition precedent to lawful naturalization is that the would-be citizen resided continuously in this country for at least five years after having been "lawfully admitted to the United States for permanent residence." 8 U.S.C. § 1427(a)(1). To be lawful, admission to the United States must have been undertaken pursuant to a valid immigration visa. See Fedorenko, 449 U.S. at 515, 101 S.Ct. 737; Koreh, 59 F.3d at 438.

With the enactment of the DPA in 1948, Congress made immigration visas available to "eligible displaced persons," thus allowing for the immigration to the United States of war refugees in excess of quota limitations. DPA § 3(a), 62 Stat. 1010. Where a naturalized citizen originally entered this country under a DPA visa, "the legality of his naturalization ultimately turns on his eligibility under that Act." *United States v. Breyer*, 41 F.3d 884, 889 (3d Cir.1994); *see also Szehinskyj*, 277 F.3d at 334. The task of the court in a proceeding brought by the United States to rescind the citizenship of a naturalized citizen admitted to this country as a displaced person is therefore to determine whether the defendant was in compliance—to the letter—with the DPA. *See Fedorenko*, 449 U.S. at 506, 101 S.Ct. 737 (recognizing "that there must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship"). At the time Mr. Kwoczak was seeking a DPA visa, certain persons were excluded from the Act's definition of "eligible displaced persons," and hence from eligibility for immigration visas. *See id.* at 495, 101 S.Ct. 737; *Breyer*, 41 F.3d at 889.

The government has alleged that Mr. Kwoczak was ineligible for a DPA visa on three grounds. As will be explained in more detail below, the government has carried its burden of proof with respect to two of its claims—to wit, that Mr. Kwoczak made willful, material misrepresentations on his visa application in violation of § 10 of the DPA, and that he assisted in the persecution of civilian populations in violation of § 2(b) of the DPA.

## A. Material misrepresentations

■ First, the government argues that Mr. Kwoczak's procurement of a DPA visa was illegal in that the information he supplied during his visa application procedure contained willful, material misrepresentations. At the time of Mr. Kwoczak's application, the DPA prohibited the issuance of a visa to "any person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person." DPA § 10, 62 Stat. 1013. For the purposes of a § 10 inquiry, the materiality of a willful misrepresentation on a visa application "must be measured in terms of its effect on the applicant's admissibility into this country. At the very least, a misrepresentation must be considered material if disclosure of the true facts would have made the applicant ineligible for a visa." *Fedorenko*, 449 U.S. at 509, 101 S.Ct. 737 (citations omitted).

Mr. Kwoczak represented to the CIC and to the American Vice–Consul in Munich that he had been occupied as a farmer throughout the war years until being sent to Ottendorf as a forced laborer in 1944; he made no mention of his training or service with the Trawniki guard forces or the Battalion Streibel. The Third Circuit, faced with a strikingly similar scenario in *United States v. Stelmokas*, 100 F.3d 302 (3d Cir.1996), noted that "if you falsely represent that your employment is one thing when your actual employment is completely different, then you have concealed your true employment.... Surely the misrepresentation that Stelmokas was a teacher was material because it hid his true employment as a *Schutzmannschaft* officer." *Id.* at 314. As in *Stelmokas*, so here, it is plain that the defendant willfully made material misrepresentations in seeking admission into the United States. This having been established by clear, unequivocal and convincing evidence, Mr. Kwoczak's citizenship must be rescinded and his certificate of naturalization cancelled.

## B. Assistance in persecution of civilian populations

■ Second, the government has alleged that Mr. Kwoczak's DPA visa was illegally obtained because Mr. Kwoczak assisted in the persecution of civilian populations. DPA immigration visas were available only to persons who established themselves to be "the concern of the International Refugee Organization [IRO]." DPA § 2(b), 62 Stat. 1009. Those persons "who [could] be shown . . . to have assisted the enemy in persecuting civil populations" were not "the concern of the [IRO]." Constitution of the International Refugee Organization, 62 Stat. 3051–52; see also Fedorenko, 449 U.S. at 495 n. 3, 101 S.Ct. 737; Szehinskyj, 277 F.3d at 334.

There are no bright-line rules to guide the court in giving content to the concept of assistance in the persecution of civilian populations; it is rather "to be applied on a case-by-case basis with reference to the relevant facts presented in each case." Koreh, 59 F.3d at 439. The parameters of this inquiry were laid out by the Supreme Court in Fedorenko. Having held that an individual's service as an armed guard at a concentration camp—regardless of whether such service was undertaken voluntarily—constituted assistance in persecution, the Fedorenko Court went on to hypothesize:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant

of the camp, fits within the statutory language about persons who assisted in the persecution of civilians. Other cases may present more difficult line-drawing problems. . . .

Id., 449 U.S. at 512 n. 34, 101 S.Ct. 737. In assessing whether a defendant assisted in persecution for purposes of the DPA, a court is to be guided by the "continuum of conduct" described in Fedorenko. Koreh, 59 F.3d at 439 (quoting Breyer, 41 F.3d at 890).

On the facts of this case, the line-drawing is not difficult: Mr. Kwoczak's established wartime activities fall squarely into the category of behavior which rendered an individual ineligible for a visa under the DPA. Mr. Kwoczak's history as a Trawniki-trained guard—particularly his service with the Fifth Company during its participation in the liquidation of the Warsaw ghetto and the Bialystok ghetto—constitutes assistance in persecution according to the settled case law Defendants in denaturalization proceedings have been found to have assisted in persecution on facts comparable to those found here. See, e.g., United States v. Dailide, 227 F.3d 385 (6th Cir.2000) (service in a Lithuanian police force during the Nazi occupation of that country, including detaining and searching Jewish civilians escaping from the ghetto and interviewing Jewish prisoners, constituted persecution of civilian populations); United States v. Hajda, 963 F.Supp. 1452 (N.D.Ill.1997) (same for service as a guard at Trawniki and Treblinka Labor Camps, and in the Battalion Streibel). The same conclusion has been reached in this circuit on a set of facts less compelling than those found here. See Koreh, 59 F.3d at 440 (involvement in the publication of anti-Semitic articles constituted assistance in persecution of Hungarian Jews).

Mr. Kwoczak argues that the government has presented no proof of specific instances of his personal and direct participation in persecution activities. As discussed above, this court finds the evidence mustered by the government sufficient to establish that Mr. Kwoczak trained and served as an armed guard in multiple locations and on multiple occasions. Neither more particularized nor more personal evidence than this is required. *See id.* at 442 ("There need be no personal participation by the defendant in the commission of physical atrocities."); *Szehinskyj*, 277 F.3d at 339; *cf. Naujalis v. I.N.S.*, 240 F.3d 642, 646 (7th Cir.2001) (quoting *Kalejs v. I.N.S.*, 10 F.3d 441, 444 (7th Cir.1993)) (in considering deportation order under the Holtzman Amendment, a court "may infer one's assistance in persecution 'from the general nature of the person's role in the war' and thus 'atrocities committed by a unit may be attributed to the individual based on his membership and seeming participation' ").

Mr. Kwoczak also argues that to the extent he may be deemed to have participated in the process of "evacuation" as a Trawniki-trained guard, his activities were not voluntary, and were in fact undertaken out of fear of possible reprisals by the SS against himself and his family. This argument is also unavailing; the *Fedorenko* Court declared itself "unable to find any basis for an 'involuntary assistance' exception in the language of [§ 2(b) ].... [A]n individual's service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa." *Fedorenko*, 449 U.S. at 512, 101 S.Ct. 737.

In sum, given Mr. Kwoczak's wartime activities in connection with the Trawniki guard forces and the Battalion Streibel, I find that the government has established by clear, unequivocal and convincing evidence that the defendant was ineligible for a DPA visa on the ground that he assisted in the persecution of civilian populations. Accordingly, Mr. Kwoczak's citizenship must be rescinded and his certificate of naturalization cancelled.

**C. Participation in a "movement hostile"**

 Finally, the government contends that Mr. Kwoczak's affiliation with the Trawniki guard forces and the Battalion Streibel constituted participation in a movement hostile to the United States and its form of government, thus rendering him ineligible for a DPA visa. The charge is brought pursuant to § 13 of the DPA, which prohibits the issuance of a visa "to any person who is or has been a member of, or participated in, any movement which is or has been hostile to the United States or the form of government of the United States." 62 Stat. 1014.

As a preliminary matter, it bears noting what the government has not alleged in this proceeding: *viz.*, that Mr. Kwoczak was a member of the SS itself—indisputably a "movement hostile" to the United States. Instead, what the government has alleged and proved is that the defendant was affiliated with the Trawniki guard forces and the Battalion Streibel, two SS auxiliary entities. The government urges the legal conclusion that both of these auxiliary entities, like the SS itself, fell within the ban of § 13. Whether defendant's status as a "Trawniki man" or as a member of the Battalion Streibel constituted membership or participation in a "movement ... hostile to the United States or the form of government of the United States" is not a question that yields an easy answer.

The case law construing the phrase "movement hostile" is sparse, and what little there is tends to be *ad hoc* ly disposi-

tive rather than broadly instructive. In *Stelmokas,* for example, our Court of Appeals sustained the determination of the district court that the defendant's wartime status as an officer in the Lithuanian *Schutzmannschaft* constituted membership in a "movement hostile." But the Third Circuit's holding that the Lithuanian *Schutzmannschaft* was a "movement hostile" rested heavily on the fact that "the Lithuanian *Schutzmannschaft* was on the State Department's 1949 'List of Organizations Considered Inimical to the United States.'" *Id.* at 314; *cf. United States v. Kowalchuk,* 773 F.2d 488, 497 n. 11 (3d Cir.1985). On the record before this court, it does not appear that either the 5th Trawniki Company (or any other Trawniki unit) or the Battalion Streibel was on the State Department's "Inimical List."

One case with marked similarities to the case before this court is *United States v. Hajda, supra.* The government's evidence established that Mr. Hajda had been trained as a Trawniki *Wachmann,* had been transferred to Treblinka as a member of a guard unit, and, finally, had been a member of Battalion Streibel, in the course of which latter service he was promoted to *Oberwachmann.* The district court concluded that "Defendant's membership and participation as an auxiliary in the guard units at Training Camp Trawniki, Treblinka Labor Camp, and SS Battalion Streibel constituted membership or participation in a movement hostile to the United States and the form of government of the United States, and rendered Defendant ineligible to receive a visa under Section 13 of the DPA." 963 F.Supp. at 1461. The applicability of this holding to the case at bar is, however, lessened to some de-

gree by the fact that defendant Hajda did not contest the legal bases on which the government sought a denaturalization decree. Mr. Hajda's defense was one of mistaken identity—*i.e.,* that he had never in fact had any connection with Trawniki, Treblinka, or the Battalion Streibel. "While Defendant disputes that he served in these units and that he misrepresented his wartime activities in order to gain entry into the United States, he does not dispute that such activities, if proven, would have rendered him ineligible to receive a visa under the Displaced Persons Act of 1948...." *Id.* at 1455.[7]

In order to determine the legal merit of the government's claim that Mr. Kwoczak was a member of a "movement hostile," it is necessary to put aside the government's separate and independent claims that Mr. Kwoczak participated in the persecution of civilian populations and that he made material misrepresentations in the course of procuring a visa for entry into the United States—claims that I have found to be fully established by evidence that satisfies the government's heavy burden of proof. With respect to the "movement hostile" claim, the question properly to be addressed can be framed in the following way: if Mr. Kwoczak had not been posted to Warsaw, Bialystok and Poniatowa, and if in 1949 he had given to the CIC and to Vice Consul Thompson an accurate account of his activities (1) as a trainee and guard at Trawniki and (2) guarding forced laborers and clearing rubble with the Battalion Streibel, would the Trawniki and/or Battalion Streibel activities, standing alone, constitute membership in a "movement hostile" to the United States and thus warrant the revocation of Mr. Kwoc-

7. Rejecting the mistaken identity defense, the court "conclude[d] that *Wachmann* Hajda and Defendant are one and the same...." *Hajda,* 963 F.Supp. at 1461. In tracing Mr. Hajda's wartime activities, the court noted his "assistance in the murder of 300 to 700 Jewish prisoners at Treblinka...." *Id.*

zak's citizenship? Since, on this record, it appears that, as of 1949—four years after the war's end—neither the Trawniki camp and its constituent units nor the Battalion Streibel had achieved listing by the State Department as "Inimical to the United States," I conclude that the government has not established, by clear, unequivocal and convincing evidence, that Mr. Kwoczak was a member of, or a participant in, a "movement ... hostile to the United States or the form of government of the United States."

## VI. Conclusion

The government has proved by clear, unequivocal and convincing evidence that Mr. Kwoczak willfully misrepresented material facts for the purpose of gaining admission to the United States. In addition, the government has proved by clear, unequivocal and convincing evidence that Mr. Kwoczak's wartime activities constituted assistance in the persecution of civilians under the IRO. On these grounds, Mr. Kwoczak was ineligible for a DPA visa. Therefore, both the order granting Mr. Kwoczak's naturalization and Mr. Kwoczak's certificate of naturalization were "illegally procured" under 8 U.S.C. § 1451(a).

For these reasons, judgment will be entered in this action for the plaintiff, the United States. The August 3, 1966 order of the United States District Court for the Eastern District of Pennsylvania, admitting defendant Mr. Kwoczak to citizenship of the United States, will be set aside, and Certificate of Naturalization No. 8962304, issued to defendant Mr. Kwoczak pursuant to that order, will be cancelled. An appropriate order accompanies this opinion.[8]

8. In concluding this opinion, I think it appropriate to express, in this footnote, my appreciation of the exemplary skill and dedication with which counsel for the United States and

### ORDER

For the reasons given in the accompanying opinion, it is hereby ORDERED that judgment in this matter be ENTERED for plaintiff the United States of America. It is further ORDERED that:

(1) The United States citizenship of defendant Fedir Kwoczak is REVOKED;

(2) The order of the United States District Court for the Eastern District of Pennsylvania, dated August 3, 1966, admitting defendant to United States citizenship, is VACATED;

(3) Defendant's Certificate of Naturalization No. 8962304 is CANCELLED;

(4) Defendant is ENJOINED from claiming any rights, privileges, benefits, or advantages under any document evidencing United States citizenship;

(5) Defendant shall forthwith SURRENDER to the Attorney General of the United States his Certificate of Naturalization No. 8962304, his United States passport, should he have one, and any other formal indicia of United States citizenship.

for the defendant have conducted this litigation. The excellence of counsel's endeavors matches the gravity of the issues posed.